## DUSENBERY *v.* UNITED STATES

No. 00–6567.   Argued October 29, 2001—Decided January 8, 2002

REHNQUIST, C. J., delivered the opinion of the Court, in which O'CON-NOR, SCALIA, KENNEDY, and THOMAS, JJ., joined. GINSBURG, J., filed a dissenting opinion, in which STEVENS, SOUTER, and BREYER, JJ., joined, *post*, p. 173.

*Allison M. Zieve,* by appointment of the Court, 532 U. S. 940, argued the cause for petitioner. With her on the briefs was *Alan B. Morrison.*

*Jeffrey P. Minear* argued the cause for the United States. With him on the brief were *Solicitor General Olson, Assistant Attorney General Chertoff, Deputy Solicitor General Dreeben,* and *William C. Brown.**

---

*\*Julia M. Carpenter* filed a brief for the DKT Liberty Project as *amicus curiae* urging reversal.

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

This case concerns the adequacy of the means employed by the Federal Bureau of Investigation (FBI) to provide notice to a federal prisoner of his right to contest the administrative forfeiture of property seized during the execution of a search warrant for the residence where he was arrested.

In April 1986, officers of the FBI arrested petitioner Larry Dean Dusenbery at a house trailer in Atwater, Ohio. Later that day, they obtained and executed a search warrant, seizing drugs, drug paraphernalia, several firearms, a ballistic knife, an automobile registered in the name of petitioner's stepmother, and various other items of personal property. Among these was $21,939 in cash, $394 of which had been found on petitioner's person, $7,500 in the inside pocket of a coat in the dining area and $14,045 in a briefcase found on the floor in the living room.

Two months later, petitioner pleaded guilty in the United States District Court for the Northern District of Ohio to a charge of possession with intent to distribute 813 grams of cocaine in violation of 21 U. S. C. §841(a)(1) (1988 ed.). He was sentenced to 12 years of imprisonment followed by 6 years of special parole. Two years later, the United States, no longer expecting the firearms and knife to be used as evidence in a future prosecution, and unable to determine their rightful owner, sought and obtained an order from the District Court authorizing the FBI to destroy them. The FBI also began the process of administratively forfeiting the cash and the automobile.

At this time, designated agents of the FBI were allowed to dispose of property seized pursuant to the Controlled Substances Act, 84 Stat. 1242, 21 U. S. C. §801 *et seq.* (1988 ed.), without initiating judicial proceedings if the property's value did not exceed $100,000, and if no person claimed an interest

in the property within 20 days after the Government published notice of its intention to forfeit and sell or otherwise dispose of it. § 881(a)(6) (subjecting to forfeiture all proceeds traceable to an unlawful exchange for a controlled substance and all moneys, negotiable instruments, and securities traceable to such an exchange); § 881(d) (providing that laws relating to summary and judicial forfeiture for violation of the customs laws apply to controlled substance forfeitures); 19 U. S. C. §§ 1607–1609 (1988 ed.) (setting forth customs law requirements for summary forfeitures).

To effect such a forfeiture, the statute required the agency to send written notice of the seizure together with information on the applicable forfeiture procedures to each party who appeared to have an interest in the property. § 1607(a). It also required the publication for at least three successive weeks of a similar notice in a newspaper of general circulation in the judicial district in which the forfeiture proceeding was brought. *Ibid.*; 21 CFR § 1316.75 (1988). The FBI sent letters of its intention to forfeit the cash by certified mail addressed to petitioner care of the Federal Correctional Institution (FCI) in Milan, Michigan, where he was then incarcerated; to the address of the residence where petitioner was arrested; and to an address in Randolph, Ohio, the town where petitioner's mother lived. App. 21–23. It placed the requisite legal notice in three consecutive Sunday editions of the Cleveland Plain Dealer. *Id.*, at 24–30. Similar practices were followed with respect to the proposed forfeiture of the car. Brief for Petitioner 3. The FBI received no response to these notices within the time allotted, and so declared the items administratively forfeited. *Ibid.*; App. 15. An FBI agent turned over the cash to the United States Marshals Service on December 13, 1988. *Id.*, at 16–17.

Nearly five years later, petitioner moved in the District Court pursuant to Rule 41(e) of the Federal Rules of Crimi-

nal Procedure[1] seeking return of all the property and funds seized in his criminal case. The United States responded that all of the items of petitioner's property that were not used in his ·drug business had been returned to him and that other items seized had long since been forfeited to the Government. The District Court denied the motion, reasoning that any challenge to the forfeiture proceedings should have been brought in a civil action, not as a motion ancillary to petitioner's now-closed criminal case. Case No. 5:95–CV–1872 (ND Ohio, Oct. 5, 1995).

The Court of Appeals for the Sixth Circuit vacated the District Court's judgment and remanded for further proceedings. Judgt. order reported at 97 F. 3d 1451 (1996), App. 31. The Court of Appeals agreed that petitioner could not pursue his claim through a Rule 41(e) motion since the criminal proceedings against him had been completed. It held that the District Court abused its discretion, however, by not construing the motion as a civil complaint seeking equitable relief for a due process challenge to adequacy of the notice of the administrative forfeiture.

Following remand, the District Court entered an order allowing discovery and subsequently presided over a telephone deposition of James Lawson, an Inmate Systems Officer who began to work in the mailroom at· FCI Milan early in 1988 and who had submitted an affidavit in the case. Lawson testified that he signed the certified mail receipt for the FBI's notice to petitioner regarding the cash. App. 49–50. He also testified about the procedures within FCI Milan for accepting, logging, and delivering certified mail addressed to inmates. *Id.*, at 50. Lawson explained that the

---

[1] Rule 41(e) provides that "[a] person aggrieved by an unlawful search and seizure or by the deprivation of property may move the district court for the district in which the property was seized for the return of the property on the ground that such person is entitled to lawful possession of the property."

procedure would have been for him to log the mail in, for petitioner's "Unit Team" to sign for it, and for it then to be given to petitioner. *Id.*, at 51. But he said that a paper trail no longer existed because the Bureau of Prisons (BOP) had a policy of holding prison logbooks for only one year after they were closed.[2] *Id.*, at 51–52.

Both parties moved for summary judgment. The District Court ruled that the Government's sending of notice by certified mail to petitioner's place of incarceration satisfied his due process rights as to the cash. Case No. 5:95–CV–1872 (ND Ohio, Jan. 19, 1999). The Court of Appeals affirmed. 223 F. 3d 422 (CA6 2000). Citing *Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U. S. 306, 314 (1950), it held that the Government's notice of the cash forfeiture comported with due process even in the absence of proof that the mail actually reached petitioner. 223 F. 3d, at 424.

Because Courts of Appeals have reached differing conclusions about what the Due Process Clause requires of the United States when it seeks to provide notice to a federal inmate of its intention to forfeit property in which the inmate appears to have an interest,[3] we granted certiorari to

---

[2] In a letter received before argument, the Solicitor General advised us that the BOP now requires the retention of certified mail logbooks for 11 years in accordance with its implementation of Government record retention policies under the Federal Records Act of 1950, 44 U. S. C. § 2901 *et seq.* (1994 ed.).

[3] See, *e. g.*, *Whiting* v. *United States*, 231 F. 3d 70, 76 (CA1 2000) (due process satisfied by Government's sending certified letter to inmate at his prison facility absent proof that mail delivery was unreliable); *Yeung Mung Weng* v. *United States*, 137 F. 3d 709, 715 (CA2 1998) (mailed notice to custodial institution inadequate unless in fact delivered to the intended recipient); *United States* v. *One Toshiba Color Television*, 213 F. 3d 147, 155 (CA3 2000) (en banc) (Government bears burden of demonstrating the existence of procedures that are reasonably calculated to ensure that actual notice will be given); *United States* v. *Minor*, 228 F. 3d 352, 358 (CA4 2000) (endorsing *One Toshiba Color Television, supra*); *United States* v. *Woodall*, 12 F. 3d 791, 794–795 (CA8 1993) (requiring actual notice to defendant or his counsel of agency's intent to forfeit property); *United States*

consider the adequacy of the FBI's notice to petitioner of its intended forfeiture of the cash. 531 U. S. 1189 (2001). We now affirm the judgment below.

The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without "due process of law." From these "cryptic and abstract words," *Mullane, supra,* at 313, we have determined that individuals whose property interests are at stake are entitled to "notice and an opportunity to be heard." *United States* v. *James Daniel Good Real Property,* 510 U. S. 43, 48 (1993).

Petitioner urges that, in analyzing his due process claim, we follow the approach articulated in *Mathews* v. *Eldridge,* 424 U. S. 319 (1976). Brief for Petitioner 12; Reply Brief for Petitioner 7. There we spoke of a balancing of three factors: (1) the private interest that will be affected by the official action, (2) a cost-benefit analysis of the risks of an erroneous deprivation versus the probable value of additional safeguards, and (3) the Government's interest, including the function involved and any fiscal and administrative burdens associated with using different procedural safeguards. 424 U. S., at 335. The United States, on the other hand, urges us to apply the method set forth in *Mullane, supra,* which espouses a more straightforward test of reasonableness under the circumstances. Brief for United States 27.

We think *Mullane* supplies the appropriate analytical framework. The *Mathews* balancing test was first conceived in the context of a due process challenge to the adequacy of administrative procedures used to terminate Social Security disability benefits. Although we have since invoked *Mathews* to evaluate due process claims in other

---

v. *Real Property,* 135 F. 3d 1312, 1315 (CA9 1998) (adequate to send summons by certified mail to jail with procedures for distributing mail directly to the inmate); *United States* v. *Clark,* 84 F. 3d 378, 381 (CA10 1996) (sufficient to send certified mail to prisoner at jail where he was located).

contexts, see *Medina* v. *California*, 505 U. S. 437, 444 (1992) (citing cases), we have never viewed *Mathews* as announcing an all-embracing test for deciding due process claims. Since *Mullane* was decided, we have regularly turned to it when confronted with questions regarding the adequacy of the method used to give notice. See, *e. g., New York City* v. *New York, N. H. & H. R. Co.*, 344 U. S. 293, 296 (1953); *Walker* v. *City of Hutchinson*, 352 U. S. 112, 115 (1956); *Schroeder* v. *City of New York*, 371 U. S. 208, 210 (1962); *Robinson* v. *Hanrahan*, 409 U. S. 38, 39 (1972) *(per curiam); Greene* v. *Lindsey*, 456 U. S. 444, 448 (1982); *Mennonite Bd. of Missions* v. *Adams*, 462 U. S. 791, 797 (1983); *Tulsa Professional Collection Services, Inc.* v. *Pope*, 485 U. S. 478, 484 (1988). We see no reason to depart from this well-settled practice.

*Mullane* itself involved a due process challenge to the constitutional sufficiency of notice to beneficiaries on judicial settlement of accounts by the trustee of a common trust fund established under state law. A trustee of such a common trust fund sought a judicial decree settling its accounts as against all parties having an interest in the fund. The only notice of the application for this decree was by court-ordered publication in a newspaper for four successive weeks. 339 U. S., at 309–310. We held that this notice was constitutionally defective as to known persons whose whereabouts were also known, because it was not "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.*, at 314, 319; see also *id.*, at 315 ("The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it").

Was the notice in this case "reasonably calculated under all the circumstances" to apprise petitioner of the pendency of the cash forfeiture? The Government here carried its burden of showing the following procedures had been used to give notice. The FBI sent certified mail addressed to

petitioner at the correctional facility where he was incarcerated. At that facility, prison mailroom staff traveled to the city post office every day to obtain all the mail for the institution, including inmate mail. App. 36. The staff signed for all certified mail before leaving the post office. Once the mail was transported back to the facility, certified mail was entered in a logbook maintained in the mailroom. *Id.*, at 37. A member of the inmate's Unit Team then signed for the certified mail to acknowledge its receipt before removing it from the mailroom, and either a Unit Team member or another staff member distributed the mail to the inmate during the institution's "mail call." *Id.*, at 37, 51.

Petitioner does not seriously contest the FBI's use of the postal service to send its certified letter to him, a method our cases have recognized as adequate for known addressees when we have found notice by publication insufficient.[4] Tr. of Oral Arg. 11 ("This case is not really a mailed notice case because the procedures that are inadequate are the procedures that happened after the mailing"). Instead, he argues that the notice was insufficient because due process generally requires "actual notice" to interested parties prior to forfeiture, which he takes to mean actual receipt of notice.[5] Brief for Petitioner 8, 15, 18–19; see also Tr. of Oral Arg. 23.

---

[4] *E. g., Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U. S. 306, 319 (1950) (noting that the mails "are recognized as an efficient and inexpensive means of communication"); *Walker* v. *City of Hutchinson*, 352 U. S. 112, 116 (1956); *Schroeder* v. *City of New York*, 371 U. S. 208, 214 (1962); *Mennonite Bd. of Missions* v. *Adams*, 462 U. S. 791, 798 (1983); *Tulsa Professional Collection Services, Inc.* v. *Pope*, 485 U. S. 478, 490 (1988).

[5] The Government's brief notes that the term "actual notice" is not free from ambiguity as used by this Court in cases such as *Tulsa, supra,* and by other courts. Brief for United States 20, n. 12 (stating that the term has been used both to distinguish notice by mail from notice by publication and to refer to the actual receipt of the notice by the intended recipient); see also Black's Law Dictionary 1087 (7th ed. 1999) (defining "actual notice" as "[n]otice given directly to, or received personally by, a party"). We think the best way to avoid this confusion is to equate, as petitioner does, "actual notice" with "receipt of notice."

For this proposition he cites *Mennonite Bd. of Missions*, 462 U. S., at 796–797. But the only sentence in *Mennonite* arguably supporting petitioner's view appears in a footnote. That sentence reads: "Our cases have required the State to make efforts to provide actual notice to all interested parties comparable to the efforts that were previously required only in *in personam* actions." *Id.*, at 797, n. 3. It does not say that the State *must provide* actual notice, but that it *must attempt to provide* actual notice. Since *Mennonite* concluded that mailed notice of a pending tax sale to a mortgagee of record was constitutionally sufficient, *id.*, at 799, the sentence is at best inconclusive dicta for the view petitioner espouses.

We note that none of our cases cited by either party has required actual notice in proceedings such as this. Instead, we have allowed the Government to defend the "reasonableness and hence the constitutional validity of any chosen method . . . on the ground that it is in itself reasonably certain to inform those affected." *Mullane*, 339 U. S., at 315.

Petitioner argues that because he was housed in a federal prison at the time of the forfeiture, the FBI could have made arrangements with the BOP to assure the delivery of the notice in question to him. Brief for Petitioner 17. But it is hard to see why such a principle would not also apply, for example, to members of the Armed Forces both in this country and overseas. Undoubtedly the Government could make a special effort in any case (just as it did in the movie "Saving Private Ryan") to assure that a particular piece of mail reaches a particular individual who is in one way or another in the custody of the Government. It could, for example, have allowed petitioner to make an escorted visit to the post office himself in order to sign for his letter. But the Due Process Clause does not require such heroic efforts by the Government; it requires only that the Government's effort be "reasonably calculated" to apprise a party of the pendency of the action; " '[t]he criterion is not the possibility of conceiv-

able injury but the just and reasonable character of the requirements . . . .' " *Mullane, supra,* at 315.

Nor does the Due Process Clause require the Government to substitute the procedures proposed by petitioner for those in place at FCI Milan in 1988. See Brief for Petitioner 17 (suggesting that the Government could send the notice to a prison official with a request that a prison employee watch the prisoner open the notice, cosign a receipt, and mail the signed paper back to the agency from which it came). The suggested procedures would work primarily to bolster the Government's ability to establish that the prisoner actually received notice of the forfeiture, a problem petitioner perceives to be the FCI Milan's procedures' primary defect. See Tr. of Oral Arg. 15 (explaining that the problem is that "[t]he procedure doesn't require verification of delivery"). But as we have noted above, our cases have never required actual notice. The facts of the present case, moreover, illustrate the difficulty with such a requirement. The letter in question was sent to petitioner in 1988, but the claim of improper notice was first asserted in 1993. What might be reasonably fresh in the minds of all parties had the question arisen contemporaneously will surely be stale five years later. The issue would often turn on disputed testimony as to whether the letter was in fact delivered to petitioner. The title to property should not depend on such vagaries.

JUSTICE GINSBURG's dissent does not contend, as petitioner does, that due process could be satisfied in this case only with actual notice. It makes an alternative argument that the FBI's notice was constitutionally flawed because it was " 'substantially less likely to bring home notice' than a feasible substitute," *post,* at 174 (quoting *Mullane, supra,* at 314–315)—namely, the methods used currently by the BOP, which generally require an inmate to sign a logbook acknowledging delivery, see *post,* at 180, 181–182 (describing current BOP procedures and noting the practicability of BOP Unit Team member's "linger[ing]" a little longer to secure an in-

mate's signature). Just how requiring the *end recipient* to sign for a piece of mail substantially improves the reliability of the delivery procedures *leading up to* that person's receipt, JUSTICE GINSBURG's dissent does not persuasively explain. Nor is there any probative evidence to this effect in the record.[6]

Even if one accepts that the BOP's current procedures improve delivery to some degree, our cases have never held that improvements in the reliability of new procedures necessarily demonstrate the infirmity of those that were replaced. Other areas of the law, moreover, have for strong policy reasons resisted rules crediting the notion that, "'because the world gets wiser as it gets older, therefore it was foolish before.'" Advisory Committee's Notes on Fed. Rule Evid. 407, 28 U. S. C. App., p. 864 (1994 ed.) (quoting *Hart* v. *Lancashire & Yorkshire R. Co.*, 21 Law Times Rep. (n. s.) 261, 263 (1869), and explaining that Rule 407's prohibition against use of subsequent remedial measures to prove fault attempts to avoid discouraging persons from taking steps to further safety). In this case, we believe the same principle supports our conclusion that the Government ought not be penalized and told to "try harder," *post*, at 180, simply because the BOP has since upgraded its policies.

Here, the use of the mail addressed to petitioner at the penitentiary was clearly acceptable for much the same reason we have approved mailed notice in the past. Short of allowing the prisoner to go to the post office himself, the remaining portion of the delivery would necessarily depend on a system in effect within the prison itself relying on prison staff. We think the FBI's use of the system de-

---

[6] To try to show that there is a "significant risk," Brief for Petitioner 14, that notice mailed to a prison will not reach an inmate, petitioner has cited several cases from various Courts of Appeals involving postforfeiture challenges. As the Government argues, these cases, like petitioner's own suit here, involve only claims that notice was not received, not findings of nonreceipt.

scribed in detail above was "reasonably calculated, under all the circumstances, to apprise [petitioner] of the pendency of the action." *Mullane*, 339 U. S., at 314. Due process requires no more.

The judgment of the Court of Appeals is

*Affirmed.*

JUSTICE GINSBURG, with whom JUSTICE STEVENS, JUSTICE SOUTER, and JUSTICE BREYER join, dissenting.

" 'The fundamental requisite of due process of law is the opportunity to be heard.' *Grannis* v. *Ordean*, 234 U. S. 385, 394 [(1914)]. This right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest." *Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U. S. 306, 314 (1950). Today's decision diminishes the safeguard of notice, affording an opportunity to be heard, before one is deprived of property. As adequate to notify prisoners that the Government seeks forfeiture of their property, the Court condones a procedure too lax to reliably ensure that a prisoner will receive a legal notice sent to him. The Court does so despite the Government's total control of a prison inmate's location, and the evident feasibility of tightening the notice procedure "as [would] one desirous of actually informing [the prisoner]." *Id.*, at 315. Because the Court, without warrant in fact or law, approves a procedure "less likely to bring home notice" than a feasible alternative, *ibid.*, I dissent.

I

The Court correctly identifies the foundational case on reasonable notice as a due process requirement, *Mullane* v. *Central Hanover Bank & Trust Co.*, and the core instruction: "[D]eprivation of . . . property by adjudication [must] be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Id.*, at 313. Further, the Court recognizes that petitioner Dusenbery's complaint does not

rest on the Government's use of the postal service to dispatch, from the Federal Bureau of Investigation (FBI) to the Federal Correctional Institution (FCI) in Milan, Michigan, notice of an impending forfeiture. *Ante*, at 169. Were this case about the adequacy of the transmission of information from the FBI to the FCI, swift summary judgment for the Government, I agree, would be in order. But the case we confront is not about notice to the prison, the warden, or the prison mailroom personnel. It is about the adequacy of notice to an individual held in the Government's custody, a prisoner whose location the Government at all times knows and tightly controls.

What process did the Government provide for getting the FBI's forfeiture notice from the FCI's mailroom to prisoner Dusenbery's cell? On that key transmission the record is bare. It contains no statement by FCI Milan's warden concerning any set of safeguards routinely employed. The Government presented only the affidavit and telephone deposition of James Curtis Lawson, an "Inmate Systems Officer" assigned to FCI Milan's mailroom. App. 36–37, 46–53. On the mailroom to prisoner transmission, Lawson said simply this: "The [Housing] Unit Team member or a correctional staff member will [after signing the mailroom logbook] distribute the mail to the inmates during the institution's mail call." App. 37. Lawson did not know whether notice was in fact delivered to Dusenbery. Nor would he have such knowledge or information regarding any other prisoner. As Lawson clarified on deposition, he was not acquainted with particular practices or systems governing mail once it left the mailroom, because that was not "pertinent to [his] department." App. 52. According to Lawson, "[t]hat would be case workers' responsibility," *ibid.;* but no caseworker filled in the evidentiary gap.

Was the prison to prisoner mode of transmission described by Officer Lawson "substantially less likely to bring home notice" than a feasible substitute that would place no "im-

practical obstacles" in the Government's way? *Mullane,* 339 U. S., at 314–315. The answer, in my judgment, is certainly yes. Before detailing why that is my view, I will examine what the Court does not elaborate: In full scope, what does *Mullane,* the foundational case, teach about the nexus to the forum and notice to interested persons necessary to make an adjudication fair and workable, and thus compatible with due process?[1]

## II

*Mullane* was a proceeding in which the trustee of a common trust fund sought from a New York Surrogate Court an order settling all questions concerning the management of the common fund during a statutorily specified accounting period.[2] Many of the beneficiaries resided outside New York. Could a New York court adjudicate such a case despite the large numbers of nonresidents affected? And if a New York court could entertain the case, would notice by publication, for which the New York statute provided, suffice to inform beneficiaries of the proceeding? The Court recognized that these were separate questions calling for discrete inquiries.

New York had jurisdiction to adjudicate despite the dispersion of trust beneficiaries among several States, the Court explained, because the trust "exist[ed] by the grace of [New York's] laws and [was] administered under the supervision of its courts." *Id.,* at 313. If New York could not take

---

[1] In briefing this case, the Government questioned whether it is "permissible for courts to approach the due process issue here as a matter of what is 'fair' or workable." Brief for United States 31. Any doubt on that score should be dispelled. *Mullane* carefully explained that the due process requirement at stake is not merely permissive, it *demands* that both fairness and practicality be taken into account. See 339 U. S., at 313–320.

[2] The decree sought by the *Mullane* trustee would terminate "every right which beneficiaries would otherwise have against the trust company, either as trustee of the common fund or as trustee of any individual trust, for improper management of the common trust fund during the period covered by the accounting." *Id.,* at 311.

hold of the case, no other State would be better situated to do so. Without a forum for periodic settlement of the trustee's accounts, the common fund device would be unworkable. Under the circumstances, New York's interest "in providing means [periodically] to close trusts [of the kind involved in *Mullane* was] . . . so insistent and rooted in custom as to establish beyond doubt the right of its courts to determine the interests of all claimants." *Ibid.*

Having thus settled the question of the nexus between the forum and the controversy necessary to establish jurisdiction to adjudicate, the Court turned to the means by which potentially affected persons must be apprised of the proceeding: "Quite different from the question of a state's power to discharge trustees," the Court began, "is that of the [full] opportunity it must give beneficiaries to contest." *Ibid.*

"Personal service of written notice," the Court acknowledged, "is the classic form of notice always adequate in any type of proceeding." *Ibid.* But that classic form, the Court next developed, "has not in all circumstances been regarded as indispensable to the process due to residents, and it has more often been held unnecessary as to nonresidents." *Id.*, at 314. For beneficiaries whose interests or addresses were unknown to the trustee, notice by publication would do, *faute de mieux. Id.*, at 318. But "[a]s to known present beneficiaries of known place of residence," *Mullane* instructed, notice by publication would not do. *Ibid.* Personal service on "the large number of known resident or nonresident beneficiaries," however, would "seriously interfere with the proper administration of the fund." *Id.*, at 318–319 (delay as well as expense rendered such service impractical). For that group, the Court indicated, "ordinary mail to the record addresses," which might be sent with periodic income remittances, was the minimal due process requirement. *Id.*, at 318. The risk that notice would not reach even all known beneficiaries, the Court reasoned, was justifiable, for the common trust

"presupposes a large number of small interests. The individual interest does not stand alone but is identical with that of a class. The rights of each in the integrity of the fund and the fidelity of the trustee are shared by many other beneficiaries. Therefore notice reasonably certain to reach most of those interested in objecting is likely to safeguard the interests of all, since any objection sustained would inure to the benefit of all." *Id.,* at 319.

In a series of cases following *Mullane,* the Court similarly condemned notice by publication or posting as not reasonably calculated to inform persons with known interests in a proceeding. See *Tulsa Professional Collection Services, Inc.* v. *Pope,* 485 U. S. 478 (1988) (notice by publication inadequate as to estate creditors whose identities were known or ascertainable by reasonably diligent efforts); *Mennonite Bd. of Missions* v. *Adams,* 462 U. S. 791 (1983) (notice by publication and posting inadequate to inform real property mortgagee of a proceeding to sell the mortgaged property for nonpayment of taxes); *Greene* v. *Lindsey,* 456 U. S. 444 (1982) (posting summons on door of a tenant's apartment provided inadequate notice of eviction proceedings); *Schroeder* v. *City of New York,* 371 U. S. 208 (1962) (publication plus signs posted on trees inadequate to notify property owners of condemnation proceedings); *Walker* v. *City of Hutchinson,* 352 U. S. 112 (1956) (publication as sole notice to property owners inadequate to inform them of condemnation proceedings). In these cases, the Court identified mail service as a satisfactory supplement to statutory provisions for publication or posting. But the decisions, it bears note, do not bless mail notice as an adequate-in-all-circumstances substitute for personal service. They home in on the particular proceedings at issue and do not imply that in the mine-run civil action, a plaintiff may dispense with the straightforward, effective steps required to secure proof of service or waiver of formal service. See Fed. Rules Civ. Proc. 4(d), 4(*l*).

## III

Returning to the instant case and the question *Mullane* identified as pivotal: Was the mail delivery procedure at FCI Milan "substantially less likely to bring home notice [to prison inmates]" than a "feasible . . . substitut[e]"? 339 U. S., at 315; cf. *Mennonite Bd.*, 462 U. S., at 803 (O'CONNOR, J., dissenting) (ability of "members of a particular class . . . to safeguard their interests . . . must be taken into account when we consider the 'totality of the circumstances,' as required by *Mullane*"). Prisoner Dusenbery's situation differs dramatically from that of persons for whom we suggested ordinary mail service, without more, would suffice. Those differences, I am persuaded, are dispositive.

A beneficiary not in receipt of actual notice in *Mullane* would nevertheless be protected, in significant measure, by beneficiaries who did receive notice and might have advanced objections shared by the large class of similarly situated persons. Moreover, the Surrogate's Court was obliged to review the trustee's accounting before approving it. In contrast, Dusenbery's alleged ownership interest stands alone. No others are similarly situated. Dusenbery claims that the money the FBI seized at his home was not traceable to an unlawful exchange for a controlled substance. See 21 U. S. C. § 881(a)(6) (1988 ed.). Absent notice of the forfeiture proceeding, Dusenbery had no opportunity to present that claim before an impartial forum. See 19 U. S. C. § 1609 (1988 ed.) (if no claim is filed within the prescribed time, the Government shall declare the property forfeited).

Nor can any undue hardship justify a less than careful endeavor actually to inform Dusenbery that his property is the subject of an impending forfeiture. The agency responsible for giving notice of the forfeiture, here, the FBI, is part of the same Government as the prisoner's custodian, the Bureau of Prisons (BOP). As the Second Circuit observed, "[w]hen [a federal] investigating agency [seeks] a prisoner's cooperation in testifying against some important wrongdoer,

it has no difficulty delivering the message in a manner that insures receipt." *Weng* v. *United States,* 137 F. 3d 709, 715 (1998). Similarly, the federal forfeiting agency should encounter no difficulty in "secur[ing] the [BOP's] cooperation in assuring that the notice will be delivered to the [prisoner] and that a reliable record of the delivery will be created." *Ibid.*

A further factor counsels care to inform a prisoner that his Government is proceeding against him or his property. A prisoner receives his mail only through the combined good offices of *two* bureaucracies which he can neither monitor nor control: The postal service must move the mail from the sender to the prison, and the prison must then move the mail from the prison gates to the prisoner's hands. That the first system can be relied upon does not imply that the second is acceptable. See *United States* v. *One Toshiba Color Television,* 213 F. 3d 147, 154 (CA3 2000); accord, *Weng,* 137 F. 3d, at 715; cf. *Houston* v. *Lack,* 487 U. S. 266, 271 (1988) (Court recognized that "the *pro se* prisoner has no choice but to entrust the forwarding of [mail] to prison authorities whom he cannot control or supervise and who may have every incentive to delay"; Court therefore held that *pro se* prisoner's notice of appeal must be regarded as "filed" when delivered to prison authorities for mailing). In the cases in which we indicated that mail notice would be sufficient, by contrast, receipt hinged only upon the dependability of the postal service, "upon which prudent men will ordinarily rely in the conduct of important affairs." *Greene,* 456 U. S., at 455; see also *Mullane,* 339 U. S., at 319 ("[T]he mails today are recognized as an efficient and inexpensive means of communication."); United States Postal Service, 2000 Comprehensive Statement on Postal Operations 91 (Table 5.1) (on-time delivery rate of first class mail between 87% and 94%).

The majority asserts that "[t]he Government here carried its burden of showing the . . . procedures . . . used to give notice." *Ante,* at 168. As to the prison to prisoner trans-

mission, that assertion is groundless, for the Government carried no burden whatever. It introduced nothing to show the reasonableness or reliability of the mailroom to cell delivery at FCI Milan at the time of the forfeiture in question. See *supra*, at 174.

Beyond doubt, the Government can try harder, without undue inconvenience or expense. Indeed, it now does so: As the Government informed the Court on brief, prison employees currently "must not only record the receipt of the certified mail and its distribution, but the prisoner himself must sign a log book acknowledging delivery." Brief for United States 24 (citing BOP Program Statement 5800.10.409, 5800.10.409A (Nov. 3, 1995)). If a prisoner refuses to sign, a prison officer must document that refusal. BOP Operations Memorandum 035–99 (5800), p. 2 (July 19, 1999). The Government noted additionally that administrative forfeiture notices, along with "appropriately marked congressional, judicial, law enforcement, and attorney correspondence," are now marked "special mail," to be "opened only in the inmate's presence." Brief for United States 29, n. 19 (citing 28 CFR §540.12(c) (2001) and BOP Program Statement 5800.10.35).

The Government, of course, should not be "penalized" for upgrading its policies. See *ante*, at 172. It would be improper to brand the BOP's 1988 procedures deficient simply because those procedures have since been improved. Nevertheless, the new rules show that substantial improvements in reliability could have been had, in 1988 and years before, at minimal expense and inconvenience. Nor will it do to label these efforts a matter of executive grace. They undeniably provide a "feasible" means "substantially [more] likely to bring home notice" than FCI Milan's prior uncertain mailroom to prison cell practice. See *Mullane*, 339 U. S., at 315.[3]

---

[3] The majority suggests that it is necessary to "explain" how "requiring the *end recipient* to sign for a piece of mail substantially improves the reliability of the delivery procedures *leading up to* that person's

The Government would assign to Dusenbery the burden of showing that the mail delivery system inside the prison was unreliable at the relevant time. Brief for United States 23–24. The Court shies away from explicit agreement, for that is not what *Mullane* instructs. Rather, the party obliged to give notice—here, the Government—must adopt a method "reasonably calculated" to reach the intended recipient. See 339 U. S., at 318; *One Toshiba Color Television*, 213 F. 3d, at 155 (If the Government "chooses to rely on less than actual notice, it bears the burden of demonstrating the existence of procedures that are reasonably calculated to ensure that [actual] notice will be given."). The Government, staying "within the limits of practicability," *Mullane*, 339 U. S., at 318, now conforms to the foundational precedent; its prior practice fell short of the requirement that "[t]he means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it," *id.*, at 315.[4]

The majority is surely correct that the Due Process Clause does not require "heroic efforts" to ensure actual notice.

receipt." *Ante*, at 172. The signature procedure now in place offers the FBI the same security that motivates any other postal customer to pay a surcharge for certified mail, return receipt requested: A sender who knows whether delivery to the addressee was accomplished can try again if the first effort fails. Moreover, if forfeiture cannot be had absent a logbook signature or documentation that the addressee refused to sign, the BOP will have every incentive to make sure its internal procedures guarantee reliable delivery. The BOP's incentive fades if all that is required is a general statement by a mailroom employee that it is prison policy to deliver inmate mail. See *supra*, at 174.

[4] The majority's concern that a more demanding proof of notice requirement would undermine finality, *ante*, at 171, is baffling: Disputes over whether notice was sent or received would be diminished, not encouraged, by requiring proof of notice by signature. Under the regime the majority tolerates, notice may be delivered or not depending on the diligence or carelessness of the prison administration and the reliability or neglect of its Unit Teams. "The title to property should not depend on such vagaries." *Ibid.*

*Ante,* at 170. But the BOP's recently installed proof of delivery procedures require no convoys of armored vehicles to "escor[t]" prisoners to the post office. *Ibid.* There is little danger that Hollywood will confuse the rescuers of Private Ryan, see *ibid.,* with a BOP Unit Team member, putatively delivering certified mail to inmates in his charge at least since 1988, instructed a decade later to linger for the additional moments required to secure for each delivery a signature in a logbook.[5] The Due Process Clause requires nothing of the Government in cases of this genre beyond the practicable, efficient, and inexpensive reform the BOP has already adopted.

Notice consistent with due process "will vary with circumstances and conditions." *Mennonite Bd.,* 462 U. S., at 802 (O'CONNOR, J., dissenting) (emphasis deleted) (internal quotation marks omitted). Given the circumstances and conditions of imprisonment, the Government must have cause to be confident that legal notices to prisoners will be delivered inside the prison with the care "one desirous of actually informing the [addressee] might reasonably adopt to accomplish it." *Mullane,* 339 U. S., at 315. The uncertain mailroom to cell delivery system formerly in place at FCI Milan

---

[5] The majority worries that a firmer rule on delivery might "also apply, for example, to members of the Armed Forces both in this country and overseas." *Ante,* at 170. Of course, many active-duty military personnel, both on and off military bases, maintain personal mailboxes and interact with local postal authorities as does any other resident. The majority is right that other members of the Armed Forces—soldiers in combat, for example—are in respects material to this case similarly situated to Dusenbery: Government authority determines their whereabouts and restricts their movements, and that same authority receives their mail at a central delivery location and must make arrangements to distribute it further. It is at least doubtful, however, that a soldier, oblivious to a pending action, would return home to find her property irrevocably forfeited to her Government because she had the misfortune to be in a combat zone too long.

fell short of that mark. Greater reliability could be achieved with modest effort. Because the Court finds that small but significant effort undue, I dissent.