OPINION
{¶ 1} Jessica Lairson and Kathy Richards appeal from a judgment of the Montgomery County Court of Common Pleas, Juvenile Division, which awarded permanent custody of Lairson's daughter, M.M., to Montgomery County Children's *Page 2 
Services ("MCCS").
 {¶ 2} M. M., who is almost three years old, came into the temporary custody of MCCS in June 2006 and was placed in foster care. Her biological mother, Lairson, is a prostitute and drug addict. MCCS developed a case plan with the goal of reunifying M.M. with Lairson, but at this point all the parties concede that Lairson is incapable of caring for M.M. and has not made any significant progress toward the completion of her case plan objectives. In fact, Lairson has not had any contact with MCCS. Paternity tests excluded Lairson's husband and two other men as M.M.'s father, and her father remains unknown. MCCS filed a motion for permanent custody of M.M. in April 2007.
 {¶ 3} Kathy Richards is Lairson's aunt. In July 2007, Richards filed a motion for legal custody of M.M. After a hearing, the magistrate recommended that permanent custody be awarded to MCCS. Lairson and Richards filed objections. In July 2008, the trial court adopted the magistrate's decision and awarded permanent custody to MCCS.
 {¶ 4} Lairson and Richards appeal from the trial court's judgment. They each argue that the trial court erred in concluding that it was in M.M.'s best interest to award custody to MCCS rather than to Richards. Lairson raises an additional argument that she was not properly served with notice of the proceedings, which was accomplished by publication. We will begin with the issue of notice.
 {¶ 5} MCCS served Lairson by publication because it claimed that her residence could not be ascertained with reasonable diligence. Lairson disputes this claim, arguing that her residence could have been easily determined by contacting the *Page 3 
Dayton Police Department or the Municipal Court because she had been arrested several times and prosecuted in the months preceding the hearing.
 {¶ 6} Due process requires that the government attempt to provide actual notice to interested parties if it seeks to deprive them of a protected liberty, such as the right of a parent to custody of his or her child, but it does not require that an interested party receiveactual notice. In re Thompkins, 115 Ohio St.3d 409, 2007-Ohio-5238,875 N.E.2d 582, ¶ 10, 14, citing Dusenbery v. United States (2002),534 U.S. 161, 170, 122 S.Ct. 694, 151 L.Ed.2d 597. "The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it," but due process does not require "heroic efforts" to ensure the notice's delivery. Id. at ¶ 14, quotingMullane v. Cent. Hanover Bank Trust Co. (1950), 339 U.S. 315.
 {¶ 7} Civ. R. 4.4(A) requires the use of "reasonable diligence" to ascertain the residence of a party. The supreme court has defined "reasonable diligence" as "[a] fair, proper and due degree of care and activity, measured with reference to the particular circumstances; such diligence, care, or attention as might be expected from a man of ordinary prudence and activity." Thompkins, 115 Ohio St.3d at ¶ 25, citing Black's Law Dictionary (5 Ed. 1979), at 412. "Reasonable diligence requires taking steps which an individual of ordinary prudence would reasonably expect to be successful in locating a defendant's address." Id., citing Sizemore v. Smith (1983), 6 Ohio St.3d 330, 332,453 N.E.2d 632.
 {¶ 8} The MCCS caseworker, Stacy Keeton, stated by affidavit that Lairson had not had contact with M.M. since early August 2006, that Lairson had not made progress on her case plan, and that MCCS had had difficulty maintaining contact with *Page 4 
her. Keeton stated that MCCS had sent letters to Lairson's last known addresses and had tried to contact her and other relatives by phone. Liarson had been terminated from substance abuse programs to which she had been referred by MCCS. During their last contact, Lairson had admitted engaging in drug abuse and prostitution. MCCS was unable to determine whether Lairson had obtained housing or legal employment. MCCS was aware of Lairson's criminal record, including charges of loitering, solicitation, and prostitution in March 2007 and an outstanding warrant for her arrest.
 {¶ 9} The trial court concluded that service by mail and public posting was proper under the circumstances presented. It stated: "The record shows several notices were mailed to several former addresses and a diligent search was conducted, which did not locate Ms. Lairson. Further the Court finds the Guardian ad Litem was also unable to locate or contract [sic] Ms. Lairson prior to the hearing. Service by publication is sufficient where the mother has a history of sporadic conduct and was unable to obtain stable housing or provide the Agency with an address to send notices. The Court finds Ms. Lairson was properly served under the circumstances of this case through mailing and posting."
 {¶ 10} We agree with the trial court's assessment that the methods MCCS used to attempt to locate Lairson were reasonable and sufficient under the circumstances and that, having failed to locate Lairson through these efforts, MCCS was justified in completing notice by mail and posting. Although, in hindsight, it appears that MCCS might have located Lairson through court and police records, MCCS took the steps which one of ordinary prudence would reasonably expect to be successful in locating *Page 5 
Lairson's address. Thompkins, 115 Ohio St.3d at ¶ 25.
 {¶ 11} Lairson's assignment of error related to notice is overruled.
 {¶ 12} Lairson and Richards each raise an assignment of error in which they assert that the trial court erred in finding that it was in M.M.'s best interest to award permanent custody to MCCS.
 {¶ 13} R.C. 2151.414(D) provides that the following factors shall be considered, along with all other relevant factors, in determining the best interest of a child:
 {¶ 14} "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 {¶ 15} "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 {¶ 16} "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period * * *;
 {¶ 17} "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]"
 {¶ 18} The best interest of the child must be established by clear and convincing evidence. R.C. 2151.414(B)(1).
 {¶ 19} In addition to her argument that the trial court's decision is not in M.M.'s best interest, Richards asserts that the trial court erred in granting permanent custody *Page 6 
to MCCS because MCCS had not developed an adoption plan and because the court did not conclude that permanent custody was the only way to achieve a secure placement for M.M.
 {¶ 20} We begin with the trial court's conclusion that it was in M.M.'s best interest to award permanent custody to MCCS. It is undisputed that M.M.'s mother was incapable of caring for her and would not have been an appropriate caregiver. The best interest analysis focused only on whether M.M. would be better off in the custody of MCCS, where her foster family could adopt her, or with Richards. M.M. had lived with her foster family for fourteen months at the time of the hearing, and the family had expressed interest in adopting her. The guardian ad litem reported that M.M. had received "excellent care" and was very loved by the foster family.
 {¶ 21} Richards had also been a steady presence in M.M.'s life. She visited M.M. regularly with another child who was in her care (M.M.'s cousin), and M.M. seemed to have bonded with both of them. MCCS had considered placing M.M. with Richards but decided against it when Richards allowed Robert Maxwell to have access to the child during a home visit. Maxwell had had a relationship with Lairson, but paternity testing proved that he was not M.M.'s father. Maxwell had unaddressed mental health issues, and the court had ordered that he have no contact with M.M.
 {¶ 22} The guardian ad litem recommended that custody be awarded to Richards. She acknowledged her "struggle" with weighing M.M.'s prospects for adoption with the foster family against the benefit of keeping her with a family member. The guardian ad litem concluded that Maxwell was no longer a concern, and she recommended that custody be awarded to Richards. *Page 7 
 {¶ 23} The caseworker, Stacy Keeton, also acknowledged that Richards had bonded with M.M. and interacted well with her. The caseworker's primary concern about placing M.M. with Richards centered on whether Richards would permit Robert Maxwell to have contact with the child. She testified that she had found Maxwell at Richards' home the second time that Richards had been permitted to take the child to her home, after Keeton had had extensive discussions with Richards about the fact that Maxwell was not allowed to see M.M.
 {¶ 24} Richards testified that Maxwell had come to her house without her permission when M.M. was present. She did not explain how or if Maxwell had known that M.M. was at the house at that time. Richards acknowledged that she had received money and furniture from Maxwell for M.M.
 {¶ 25} The trial court clearly considered M.M.'s relationships with her foster parents, aunt, and cousin, the guardian ad litem's recommendation, M.M.'s custodial history, and her need for a secure placement, as required by R.C. 2151.414(D). The trial court concluded that her most secure placement would be with MCCS so that the foster family could pursue an adoption.
 {¶ 26} Although this case presents a closer call than many other permanent custody cases, we cannot conclude that the trial court abused its discretion in concluding that M.M.'s best interest would be served by granting custody to MCCS. The magistrate expressed doubt about Richards' truthfulness, especially in regard to her criminal history, and concluded that it was not in M.M.'s best interest "to remove the child from the home she has known for the majority of her life to place her in the home of a biological relative." The court noted that M.M. already had a "sense of *Page 8 
permanency" with her foster family and that her best chance for permanency was through adoption. The court observed that Richards "quickly violated" a court order about contact with Maxwell when M.M. was allowed to visit her home. In the absence of a successful pattern of visitation with Richards, the court reasonably concluded that the most secure placement for M.M., and the one that was in her best interest, was with MCCS. Contrary to Richards' assertion, the court was not required to conclude that granting custody to MCCS was the only secure placement; it was charged with determining the most secure placement, which is the one that would best serve M.M.'s interests.
 {¶ 27} Richards' contention that MCCS was required to develop an adoption plan before seeking permanent custody of M.M. has been rejected by the Supreme Court of Ohio. See In re T.R., — Ohio St.3d-,2008-Ohio-5219, ¶ 12.
 {¶ 28} The assignments of error are overruled.
 {¶ 29} The judgment of the trial court will be affirmed.
BROGAN, J. and DONOVAN, J., concur.
Copies mailed to:
Johnna M. Shia
Richard Hampfling
Richard A. F. Lipowicz
 Hon. Nick Kuntz *Page 1