# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 20, 2012

No. 10-10989

Lyle W. Cayce
Clerk

THE AMERICAN CANCER SOCIETY,

Interested Party - Appellant

v.

Receiver, KAREN L. COOK,

Receiver - Appellee

Appeal from the United States District Court
for the Northern District of Texas

Before JONES, Chief Judge, and HIGGINBOTHAM and SOUTHWICK, Circuit Judges.

EDITH H. JONES, Chief Judge:

Karen Cook ("Cook") was appointed receiver over the assets of a number of related corporations and individuals, who the Securities and Exchange Commission ("SEC") alleged violated multiple federal securities laws. Cook discovered that before the SEC filed its civil complaint, the corporate entities involved had made charitable contributions to the American Cancer Society ("ACS") totalling $240,000. Cook moved to recover the donations on behalf of the receivership, arguing that they qualified as fraudulent transfers under Texas's Uniform Fraudulent Transfer Act ("TUFTA"). TEX. BUS. & COM. CODE § 24.005(a). The district court granted the motion and entered judgment

against ACS for the full $240,000. ACS has appealed. We REVERSE. The Receiver's attempt to liken the scheme in question to a "Ponzi-like fraud," and therefore reduce her burden to proving "presumed intent to defraud," fails for lack of evidence. Not all securities frauds are Ponzi schemes.

## I.

On September 28, 2009, the SEC commenced the underlying action for alleged violations of federal securities laws against Giant Operating, LLC, George Wesley Harris ("Harris"), Stephen Christopher Plunkett ("Plunkett"), Giant Petroleum, Inc., and DSSC Operating, LLC. The corporate entities will sometimes be collectively referred to as "Giant." In its complaint, the SEC alleged that between December 2007 and September 2009, Giant Operating, by and through Harris, raised approximately $13.4 million from investors through five unregistered securities offerings. The offered securities were interests in oil-and-gas drilling programs, which promised considerable returns within twelve months. Investment brochures claimed that 80% of the offering proceeds would be spent on operational costs—such as drilling, testing, and completion—while the remaining 20% would be spent on management costs. In reality, according to the SEC, a considerable portion of investor funds was transferred from Giant Operating to a DSSC account, which Harris devoted to personal expenses unrelated to oil-and-gas programs. Harris also transferred millions of dollars to defendants Plunkett and Giant Petroleum, another company Harris owned and controlled. Based on these allegations, the SEC charged multiple violations of federal securities laws.

After suit was filed, the district court appointed Cook as receiver over the defendants' assets (except those of Plunkett). The court authorized Cook to "immediately take and have complete and exclusive control, possession, and custody of the Receivership Estate and to any assets traceable to assets owned by the Receivership Estate." Cook was also authorized to "[i]nstitute such actions

No. 10-10989

or proceedings to impose a constructive trust, obtain possession, and/or recover judgment with respect to persons or entities who received assets or records traceable to the Receivership Estate."

Shortly after her appointment, Cook discovered that the corporate defendants had made a number of transfers to ACS from 2007 to 2009 as a sponsor of ACS's Cattle Baron's Ball. Giant contributed at least $240,000 to this major fundraising event over the three-year period. Cook filed a series of motions seeking the turnover of these contributions. To support the receivership's claim to these funds, Cook asserted a number of theories. Cook principally argued that the donations were recoverable as fraudulent transfers under TUFTA. *See* Tex. Bus. & Com. Code § 24.005(a). She also proffered an equitable theory of constructive trust, arguing that actual fraud justified disgorgement of the contributions. The parties agreed that Cook's turnover motion would be determined by submission of evidence to the court without the necessity of a trial.

Adopting the findings and conclusion of the magistrate judge, the district court concluded that the funds were recoverable as fraudulent transfers. The court reasoned that because defendants were operating a "Ponzi-like scheme," their transfers to ACS were presumptively made with fraudulent intent. *Warfield v. Byron*, 436 F.3d 551, 558-59 (5th Cir. 2006). The court rejected defenses raised by ACS pursuant to TUFTA, granted Cook's motion, and entered judgment against ACS for the full $240,000. ACS timely filed its interlocutory appeal.

## II.

To recover the transfers from Giant to ACS, the receivership was required to demonstrate that ACS received transfers from Giant that were made with actual intent to hinder, defraud or delay creditors. *See* Tex. Bus. & Com. Code § 24.005(a). The district court found that Cook satisfied her burden of proving intent to defraud with an affidavit that described Giant's operations and

3

ultimately concluded that Giant was a "Ponzi-like" scheme. This court has held that transfers from a Ponzi scheme are presumptively made with intent to defraud, because a Ponzi scheme is, "as a matter of law, insolvent from its inception." *Warfield*, 436 F.3d at 558. The burden then shifts to the recipient of Ponzi-generated funds to prove an applicable TUFTA defense. On appeal, ACS argues that the evidence before the district court did not support the Ponzi-scheme finding. We agree.

A Ponzi scheme is a "fraudulent investment scheme in which money contributed by later investors generates artificially high dividends or returns for the original investors, whose example attracts even larger investments." *Janvey v. Alguire*, 647 F.3d 585, 597 (5th Cir. 2011) (quoting BLACK'S LAW DICTIONARY 1198 (8th ed. 2004)). In finding that Giant operated "like" a Ponzi scheme, the district court relied upon an affidavit from Cook, who served as the custodian of records for Giant and the receivership. Based on her alleged review of relevant business records, Cook attested that (1) investor funds constituted virtually all of Giant's revenue; (2) those funds were commingled and used for personal and unauthorized expenses; (3) Giant did not operate a profitable business outside of money received from new investors; (4) investor funds were used to pay "returns" to some investors; and (5) Giant used some of its funds to procure new investors. Thus, the affidavit concluded, "Giant was a fraudulent *Ponzi*-type scheme." Attached to the affidavit were three exhibits that purported to support her conclusions.

ACS argues that neither the record in general, nor the attendant exhibits in particular, provide any evidence to substantiate Cook's conclusions. We review the district court's Ponzi-scheme finding for clear error. *See Cadle Co. v. Duncan* (*In re Duncan*), 562 F.3d 688, 694 (5th Cir. 2009) (per curiam). "A finding of fact is clearly erroneous only if on the entire evidence, the court is left with the definite and firm conviction that a mistake has been committed." *Id.* (quoting

No. 10-10989

*Robertson v. Dennis (In re Dennis)*, 330 F.3d 696, 701 (5th Cir. 2003)). In this case, we are left with such a conviction.

The sole evidence relied upon by the district court was Cook's affidavit and the attending exhibits. The testimony in the affidavit, however, is highly conclusory and thus depends on the data furnished in the exhibits. The exhibits included the following: a summary of Giant's profitability, a list of payments made by Giant Operating to DSSC, and what appears to be a checkbook registry of an account of DSSC at Comerica Bank. Nothing in these documents demonstrates that investor funds were used to issue "returns" to other investors–a *sine qua non* of any Ponzi scheme. *See Janvey*, 647 F.3d at 597. In fact, at oral argument, Cook's counsel failed to identify in those exhibits any instance in which a single payment was made to an investor. The absence of even a single investor "payout"–which would be, by its nature, easy to show–convinces us the district court erred in placing determinative weight on Cook's declaration that Giant operated as a Ponzi scheme. By contrast, in *Janvey* this court found credible a declaration that provided "clear, numerical support for the creative reverse engineering undertaken" by the Ponzi scheme and specifically itemized the assets and returns of the company. 647 F.3d at 597. Because of this critical deficiency, the district court erred in applying the presumption of fraudulent intent. Giant may well have operated as a fraudulent or at least badly mismanaged drilling investment program, but there was no proof that its perpetuation, unlike that of a traditional Ponzi scheme, was based on the manufacturing of "returns" to investors from other investors' contributions.

Cook argues, however, that even if Giant was not technically operating a Ponzi scheme, her fraudulent transfer theory is supported by circumstantial evidence that the transfers to ACS were made with actual fraudulent intent. *See Roland v. United States*, 838 F.2d 1400, 1402-03 (5th Cir. 1988) ("[C]ourts may

No.  10-10989

rely on circumstantial evidence to establish the fraudulent intent."). Cook asserts that the purpose of the ACS donations was to lure new investors into Giant's fraudulent scheme, and that the donations were not an authorized use of the investors' money. The only support for these assertions, however, is a citation to Cook's affidavit, the relevant portions of which are too conclusory and factually bare to support the district court's holding. *See N.W. Enters. Inc. v. City of Houston*, 352 F.3d 162, 182-83 (5th Cir. 2003). The affidavit baldly asserts that based on her investigations, "it is clear that the donations to ACS were made with the purpose of luring new investors and to keep the fraudulent scheme going." Cook provides no explanation for this conclusion, nor any supporting facts to bolster this claim. Moreover, while the SEC complaint contained allegations relevant to the issue of authorized uses of investment proceeds, a complaint "is not evidence of the charges contained in it." *Scholes v. Lehmann*, 56 F.3d 750, 762 (7th Cir. 1995). The dearth of evidence corroborating Cook's testimony is, in short, dispositive. Accordingly, the district court clearly erred in finding that the donations to the Cattle Baron's Ball were fraudulent transfers according to TUFTA.[1]

### III.

Nevertheless, Cook urges the court to affirm the judgment below based on alternative arguments not addressed by the district court. *See LLEH, Inc. v. Wichita Cnty.*, 289 F.3d 358, 364 (5th Cir. 2002) ("'[W]e may affirm for reasons other than those relied upon by the district court.'" (alteration in original) (quoting *Joslyn Mfg. Co. v. Koppers Co.*, 40 F.3d 750, 753 (5th Cir. 1994))). We address each in turn.

---

[1] This conclusion makes it unnecessary for us to consider ACS's defenses that it received Giant's contributions in good faith and for value received. *See* TEX. BUS. & COM. CODE § 24.009(a).

No. 10-10989

First, Cook argues that the receivership order–which authorized Cook to take possession of "any assets traceable to assets owned by the Receivership" and to institute actions necessary to achieving this end–provides an independent justification for the $240,000 judgment against ACS. This argument is meritless. Giant's transfers to ACS occurred between January 10, 2007, and August 13, 2009, before the SEC filed its complaint or the court entered the receivership order. To convey title, the only requirements were that Giant intend to make gifts and deliver the funds, and that ACS accept. *See, e.g.*, *Hayes v. Rinehart*, 65 S.W.3d 286, 289 (Tex. App. 2001) (enumerating three elements of a valid gift). Cook does not argue that the Giant defendants lacked capacity to convey title to the funds when the transfers occurred. We do not construe this boilerplate enabling order to do anything other than authorize Cook to pursue the recovery of assets that may have been transferred by the defendants in violation of governing law. Thus, it became incumbent on Cook to establish an independent legal basis to justify their recovery. If the court's enabling order purported to divest ACS of $240,000—based solely on litigation to which ACS was not then a party, of which it had not received notice, and against which it had no opportunity to defend—would raise serious due process concerns. *See Dusenbery v. United States*, 534 U.S. 161, 167, 122 S. Ct. 694, 699 (2002) (noting that individuals whose property interests are at stake are entitled to notice and an opportunity to be heard). Cook's argument simply cannot support the district court's judgment.

Second, Cook urges the court to impose a constructive trust on ACS's assets, arguing that the funds at issue rightfully belong to the defrauded investors of Giant. Under Texas law, a constructive trust is an equitable remedy that may be imposed if the following elements are present: (1) actual or constructive fraud; (2) unjust enrichment of the wrongdoer; and (3) tracing of the property over which the trust is placed to some identifiable res in which the

7

No.  10-10989

plaintiff has an interest.  *Burkhart Grob Luft und Raumfahrt GmbH & Co. KG v. E-Sys., Inc.*, 257 F.3d 461, 469 (5th Cir. 2001).  The decision to resort to this remedy, however, is entrusted to the discretion of the court.  *Id.*  In this case, the equities militate against a constructive trust on Giant's charitable contributions to ACS.  As noted above, there is no evidence that Giant's contributions furthered any fraudulent scheme or were otherwise made with intent to defraud investors.  ACS relied upon Giant's contributions in hosting the Cattle Baron's Ball and incurred considerable expense in connection with receipt of those funds.  These circumstances, combined with ACS's status as a charitable organization, tilt the equities in its favor.  Consequently, the remedy of constructive trust is not appropriate to disgorge Giant's charitable donations to ACS.

## IV.

For these reasons, the judgment of the district court is REVERSED.