ROGERS, Circuit Judge, dissenting.
Is Mathews v. Eldridge , a bedrock of the modern law of procedural due process, still good law? One would hardly think so from the arguments of plaintiffs that it does not apply in this case, its marginalization by the district court in the Hicks case below, and its demotion to backup status by the majority.
I.
In the decade after the Supreme Court recognized in Goldberg v. Kelly that the continued receipt of government benefits was a property interest protected by the Due Process Clause, the Supreme Court gave clarity and coherence to that law. 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). First, the Court required, in Board of Regents of State Colleges v. Roth and its progeny, the careful identification of a property or liberty interest. 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Second, in determining whether a particular procedural protection was required, the Court in Mathews v. Eldridge balanced the private and governmental interests at stake through the prism of its three-part balancing test. 424 U.S. 319, 334-35, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Under that approach, a court must weigh "(1) the burdens that a requested procedure would impose on the Government against (2) the private interest at stake, as viewed alongside (3) the risk of an erroneous deprivation of that interest without the procedure and the probable value, if any, of the additional *814 procedural safeguard." Kaley v. United States , 571 U.S. 320, 333, 134 S.Ct. 1090, 188 L.Ed.2d 46 (2014) (citing Mathews , 424 U.S. at 335, 96 S.Ct. 893 ) (quotation marks omitted). The Supreme Court has applied this analysis, in these terms, in dozens of cases, with remarkable consistency, for over forty years.[1] There is no hint that it is not good law. To shunt it aside, or to relegate it to an afterthought, or to focus on so-called "long-standing principles of procedural due process that predate the Mathews test," baldly defies longstanding foundational Supreme Court precedent.
The plaintiffs' attempt to shift the focus from the application of rock-solid precedent suggests that plaintiffs anticipate losing under that precedent. Indeed, plaintiffs do inexorably lose under the Mathews v. Eldridge test. First, while the plaintiffs' property interest in continued benefits is certainly substantial, the district court in Carter gave considerable reasons why that harm is categorically limited. Mathews makes clear that this weight-of-the-property-interest factor is to be determined categorically, that is, by the nature of the benefits rather than by the individual harm that one plaintiff may suffer. See Mathews , 424 U.S. at 340-43, 96 S.Ct. 893. Second, the government has an obviously strong interest in not erroneously restoring Social Security benefits on the basis of evidence from fraudsters. Apart from the dollar loss, the value of the integrity of the administration of government benefits-and the popular perception of integrity-is *815 enormous. Finally, the factual accuracy of eligibility redeterminations is only minimally enhanced by the additional procedural protection sought by plaintiffs and awarded below in Hicks . The procedure sought is to require the agency to consider evidence provided by a lawyer and doctor who together have concededly engaged in wholesale fraud against the same agency for the same type of benefits, unless the agency can show that they acted fraudulently with respect to the particular claimant . It is fanciful to think that this protection will significantly improve the accuracy of eligibility redeterminations.
The court below in Hicks , concededly "avoid[ing]" the Mathews v. Eldridge analysis for the major part of its opinion, see Hicks v. Colvin , 214 F.Supp.3d 627, 630-41 (E.D. Ky. 2016), boils procedural due process down to an over-simplified principle ("[w]hen the government asserts a fact about someone and that affects her rights, due process provides her a chance to challenge the assertion," id. at 634 ), and then uses the "naked eye" to apply that principle in a way that cannot be reconciled with the analysis mandated by Roth and Mathews . Here is how this simplification leads to the wrong conclusion: The purported essence of procedural due process is the ability to challenge facts affecting a plaintiff's rights. Whether there is "reason to believe" the prior application was fraudulent is a fact affecting each plaintiff's rights because without it there would have been no redeterminations of eligibility in the first place. Ergo, each plaintiff is entitled to challenge whether there was fraud.
Such reasoning elides the whole carefully wrought structure of procedural due process. Standard due process analysis requires a clear identification of a property interest and the application of the Mathews v. Eldridge analysis to the deprivation of that interest. In this case there are two determinations, by two different administrative bodies, that affect two distinct interests. First there is the decision that eligibility must be redetermined, and second is the question of eligibility itself. There is no property or liberty interest in the first. The statute provides for a redetermination in certain circumstances that are independent of whether a claimant is eligible for benefits ("reason to believe" fraud on the part of the lawyer and doctor). There is no more a protected property interest in avoiding a redetermination in these circumstances than had the statute provided for random redeterminations or for redeterminations scheduled on a three-year interval. Indeed, plaintiffs do not claim to have a property interest in avoiding a redetermination.[2] Thus, even though the decision to redetermine is obviously a precondition to losing benefits, and therefore "affects her rights" in a colloquial sense, it does not affect the actual determination of eligibility for benefits, which is the property interest properly identified in this case.[3]
*816 Here, following ample notice, an administrative law judge terminated plaintiffs' disability benefits (the deprivation) because it determined there was not sufficient evidence of disability in the medical records initially submitted with the application, the new evidence submitted by plaintiffs, and any testimony given (the evidence) after hearing argument from plaintiffs and their counsel (the opportunity to challenge the evidence). That is textbook due process. The question is whether due process requires even more-specifically, an opportunity for plaintiffs to challenge the Inspector General's "reason to believe" that fraud was involved in their original applications, so that they might use the evidence excluded because of that belief. A straightforward balance of the Mathews factors says no.
Private Interest at Stake. As Mathews v. Eldridge itself makes clear, it is the general nature of the harm, and the types of relief that are generally available, that fix the weight of the property interest at stake. See 424 U.S. at 344, 96 S.Ct. 893. Giving short shrift to Mathews v. Eldridge makes it easier for plaintiffs to focus on the particular harms to particular plaintiffs resulting from adverse disability determinations. Instead, viewing in generality the stakes to plaintiffs as a class, as the district court below in Carter thoughtfully examined, this interest is substantial, but not as substantial as, for instance, the loss of welfare benefits in Goldberg v. Kelly , and of course not nearly so portentous as the detention in Hamdi .
Here the parties agree that the property interest being deprived is the continued receipt of Social Security by an eligible recipient. But any plaintiff suffering from a current disability can establish a new forward-looking entitlement by filing a new application for benefits. If successful, those monthly payments should make up for the lost benefits going forward. All plaintiffs were informed of this right to submit new applications when they received unfavorable redetermination decisions, and five of the seven plaintiffs who have taken advantage of this right have been approved for benefits.
Plaintiffs may also apply for a waiver of overpayment, so long as they were not at fault for the fraudulent aspects of their prior application and collection of past payments would be inequitable. If granted, an overpayment waiver would relieve plaintiffs of having to pay back the years of benefits they had received before termination, otherwise one of the harshest consequences of an unfavorable redetermination. See 42 U.S.C. § 404(b) ; see also 20 C.F.R. §§ 404.501 -.502a, 404.506-.512. On a request for a waiver, it is the Commissioner's burden to prove fault, so every plaintiff unaware of the prior fraud should qualify. To this point, waivers have been granted to 98% of Conn-related beneficiaries who have requested one.
Together, an overpayment waiver coupled with a new, prospective benefits award drastically reduce the hardship of deprivation by allowing plaintiffs to retain earlier monthly payments and ensuring continuous benefits save only for the (likely short) period between the end of the old benefits and beginning of the new ones.[4] Of course, these mitigators are not guaranteed-an applicant must qualify for disability benefits to receive a new award and be without fault to obtain a waiver. But the *817 likelihood in general that a genuinely eligible recipient wrongfully stripped of benefits will not be able to prove her current disability is small.
These protections are readily available to nearly every plaintiff who would benefit from the additional process sought-and it is those plaintiffs that our inquiry must focus on. These mitigators are not enough to zero out plaintiffs' interest in the receipt of their benefits, but they do go a long way in reducing the degree of deprivation created by an erroneous eligibility determination.[5]
Public Interests at Stake . On the other side of the scale rest the weighty public interests in a functioning disability benefits regime free from the taint of fraud and from overly burdensome and costly procedures. Most obviously, there is an enormous public interest in avoiding the taint of fraud on determinations by one of the largest and most significant government benefits programs in the United States. Confidence in the integrity of the system of awarding benefits is crucial to public acceptance of the statutorily imposed obligation of almost all working Americans to pay Social Security taxes on their income. Permitting the award of benefits based on evidence provided by a doctor through a lawyer to an ALJ when all three have concededly conspired, at least in other cases, to defraud the Social Security disability benefits system obviously undermines confidence in the system. Avoiding this is a substantial public interest.
There are also significant administrative costs. As was the case in Mathews , the "most visible burden would be the incremental cost resulting from the increased number of hearings." See 424 U.S. at 347, 96 S.Ct. 893. Significantly, that cost would "come out of the pockets of the deserving since resources available for any particular program of social welfare are not unlimited." Id. at 348, 96 S.Ct. 893. That burden would be even greater here, where the hearings sought are not run-of-the-mill benefits determinations (which are already provided), but complex evidentiary hearings into wide-ranging fraud schemes. Hearings of this sort would require officials to spend inordinate time testifying over and over again about that Inspector General's investigation into the Conn fraud-time not spent investigating other Social Security frauds.[6]
What is more, grafting these sorts of evidentiary mini-trials onto the redetermination *818 process would thwart Congress's objective of redetermining benefits effectively and immediately. The redetermination process was created to protect the agency from the lasting effects of benefits frauds. But to undo Congress's evidentiary restriction would serve to introduce categorically unreliable evidence back into the redetermination process and risk re-exposing the agency to the continuing effects of fraud. Congress had large-scale frauds like this in mind when it crafted a "streamlined procedure enabling the [Commissioner] ... to expeditiously terminate fraudulently obtained [disability] benefits." See 140 Cong. Rec. H4750-03 (1994) (Stmt. of Rep. Pickle). As did the Commissioner in implementing Congress's statutory design. We should be loath to substitute our own policy considerations for those unquestionably better suited-and constitutionally empowered-to make them. See Mathews , 424 U.S. at 349, 96 S.Ct. 893.
Plaintiffs argue that the burden of additional evidentiary hearings cannot be prohibitively heavy considering that the Commissioner provides similar hearings when agency staff-and not the Inspector General-has reason to believe fraud was involved in an application. But the Commissioner's argument does not hinge on the proposition that it would be impossible to provide the hearings, merely that the cost of doing so in these circumstances outweighs the benefits gained. Moreover, the Commissioner has good reason for treating those two scenarios differently-where a law enforcement entity like the Inspector General investigates and forms a reason to believe that fraud occurred, the cost of challenging that determination is higher and the benefit much lower. That is, in part, because Inspector General investigations are often much larger and more complex than their non-law-enforcement counterparts, and also because determinations by a law enforcement entity with investigative expertise serve as a check against arbitrariness and are less likely to be rebutted.
Risk of Erroneous Deprivation . Under a proper application of the Mathews balancing test, the additional procedure sought-the ability to present evidence from fraud-tainted sources-is hardly likely to reduce the risk of wrongful deprivation of the (properly identified) property interest at stake-continued receipt of eligible disability benefits. Once again, giving short shrift to the standard procedural due process analysis leads the analysis astray, here by permitting exaggeration of the risk of erroneous deprivation. Once the property interest at issue is properly identified as the loss of disability benefits, and not the avoidance of a redetermination or the use of certain evidence, it becomes clear that little increase in accuracy would result from considering evidence provided by Conn and one of the four conspiring doctors.
In evaluating the risk of erroneous deprivation, we start by evaluating the current administrative process. See Mathews , 424 U.S. at 344, 96 S.Ct. 893. The process in place is intuitive and robust. After the Inspector General notified the Commissioner that it had reason to believe that fraud was involved in the applications of some 1,787 applicants formerly represented by Conn, the Administration's Appeals Council internally reviewed each case to determine whether, disregarding the tainted evidence, the record supported the original award. Some two hundred and fifty applications contained sufficient evidence and were unaffected. For the remainder, including plaintiffs, the Appeals Council found insufficient evidence of disability and notified those individuals that further proceedings were required. Those individuals were notified that they could submit new evidence for a second review by the Appeals *819 Council. Following that second review, the cases were submitted to administrative law judges for further evidence gathering, which the Commissioner was statutorily obligated to assist with. Given the time lapse, plaintiffs were permitted to submit new, after-the-fact evidence in lieu of historical medical records so long as the new evidence was relevant to the existence of a disability at the time of the original application. After all of that additional evidence gathering, administrative law judges conducted individualized hearings-at which plaintiffs could testify and were represented by counsel-to determine whether there was sufficient evidence of disability. All told, about 55% of recipients whose Conn-related redeterminations are complete have received favorable decisions.
That is a lot of process. More importantly, it is process designed to minimize the risk that deserving applicants will be wrongly stripped of benefits. Two key features are worth emphasizing. First, the administrative law judge reviews anew all of the evidence from the original application, save only for the single report submitted by one of the crooked doctors. That review is significant because the Commissioner is statutorily charged during the initial stages of review (of the original application) to assist in "develop[ing] a complete medical history" of at least the twelve months preceding the application, including by scheduling consultative examinations where needed. See 42 U.S.C. § 423(d)(5)(A), (B) ; see also 20 C.F.R. § 404.1512. The existing case file, then, should paint a detailed picture of the applicant's disability at the time of the initial determination-the very thing at issue on redetermination.
Second, the opportunity to submit new evidence enables plaintiffs to fill in any gaps left open in the existing case file and to provide substitute evidence for any truthful information contained in the excluded reports. Of course, given the lapse of time, it may sometimes prove difficult to find substitute evidence, but those difficulties are eased in two significant ways. First, the earlier development of the case file means that the most relevant medical records should already be available to the administrative law judge. Second, where older records are unavailable, recipients may develop and submit new evidence, along with authority (expert testimony or otherwise) that such evidence bears on the relevant period. For example, a recipient, like Hicks, suffering from a cognitive disability could take an IQ test today and submit the results as evidence of prior disability, since intellectual capabilities generally remain stable throughout life, see Program Op. Manual Sys. (POMS) DI 24515.055; Williams v. Mitchell , 792 F.3d 606, 620 n.4 (6th Cir. 2015).
Plaintiffs argue that the risk of an erroneous deprivation (from excluding evidence from a tainted combination of sources) is too high because there is too great a risk that, in any one case, the Inspector General might have had no "reason to believe" fraud was involved-meaning evidence was excluded that should not have been. But again, this conflates the risk of wrongfully excluding evidence with the risk of wrongfully terminating benefits. Plaintiffs have a protected interest in only the latter, and the risk of wrongfully excluding evidence is relevant only as it raises a serious risk of wrongfully terminating benefits-and in most cases it does not.
That is because the one-off reports by non-treating physicians that were excluded are weak evidence as a matter of agency regulation.[7] Under those regulations, controlling *820 weight can only be given to evidence from treating physicians. See 20 C.F.R. § 404.1527(c)(2). None of the excluded reports were from treating physicians; they were from one-time examining doctors and were probative only to the extent that they were consistent with the plaintiffs' overall medical records. See 20 C.F.R. § 404.1527(c)(4). Moreover, even if there were no showing that the physician engaged in fraud with respect to the particular plaintiff, the fact that-as plaintiffs appear to concede-the lawyer, ALJ, and doctors had otherwise conspired in at least some other cases to commit Social Security fraud would-permissibly, and doubtless drastically-reduce their credibility.
Thus, it is simply wrong to say that the exclusion virtually decides the ultimate issue of eligibility. Plaintiffs observe that because they were successful in their initial applications, when they had the reports, and only failed on redetermination, without them, they must be dispositive. But that observation forgets another, rather important, distinction: plaintiffs' original applications were granted by an administrative law judge on the Conn payroll who rubberstamped every application sent his way regardless of the evidence. The point is that any neutral administrative law judge to consider the reports on redetermination would be bound by regulation to afford them little, if any-and in no case, controlling-probative value.
Even assuming the reports might have some probative value, it would remain next to impossible for any plaintiff to rebut the Inspector General's "reason to believe" that fraud was involved-meaning any hearing on that question would be of little practical worth. The statute requires the Commissioner to "disregard any evidence if there is reason to believe that fraud or similar fault was involved in the providing of such evidence." 42 U.S.C. § 405(u)(1)(B). That is a very low bar. Alternatively, plaintiffs would face a very high bar in showing that no such reason exists. Even compelling evidence to the contrary might well fall short of showing that there was no reason to believe fraud was involved. Plaintiffs would require the Commissioner to provide evidence specifically tying the fraud to their individual applications, but the low bar does not require even that. Evidence of the conspiracy between Conn and the four corrupt doctors already provides "reason to believe" that each of the reports those doctors submitted at Conn's behest was tainted by fraud. It is difficult to imagine how any plaintiff could ever show otherwise, considering plaintiffs, as victims, likely do not know whether fraud was involved in their own cases.
In Congress's view, it is a feature-not a bug-that this standard is so low. Having a "reason to believe" is not the end, but rather the beginning of the redetermination process, and a more adversarial determination would defeat the gateway function that the standard serves. It is also the *821 type of determination that can be made reliably by a third party without an adversarial hearing. In Kaley , for instance, the Court held that the adversarial process "is far less useful to the threshold finding of probable cause," which "by its nature, is hard to undermine, and still harder to reverse." 571 U.S. at 339, 134 S.Ct. 1090. That Congress set such a standard suggests it intended a non-adversarial determination from the start.
For its part, the Supreme Court has upheld initial non-adversarial findings by independent third parties as a check against arbitrary deprivations. See, e.g. , F.D.I.C. v. Mallen , 486 U.S. 230, 244-45, 108 S.Ct. 1780, 100 L.Ed.2d 265 (1988). In Gilbert v. Homar , for instance, the Court upheld a state procedure that caused the State to suspend an employee upon learning that the employee was charged with a felony. 520 U.S. 924, 926-27, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997). Rejecting the argument that due process required a pre-suspension hearing, the Court held that the finding of probable cause and bringing of charges "by an independent body [the police] demonstrate that the suspension is not arbitrary." See id. at 934, 117 S.Ct. 1807. In other words, a third-party finding of fault was enough to trigger the deprivation of a constitutionally protected interest (continued employment), so long as the employee could eventually challenge the ultimate deprivation. The principle applies with even greater force here because the Inspector General's finding does not trigger the deprivation (the termination of benefits), only the redetermination, and like in Gilbert , the plaintiffs had the opportunity to challenge the ultimate deprivation.
In sum, the redetermination inquiry asks whether plaintiffs would have been entitled to disability benefits at the time of their original applications had those applications not included evidence tainted by the possibility of fraud. To answer that question accurately and efficiently, an administrative law judge reviews the original claims file (which presents a snapshot of the claimant's medical condition at the time of her original application) and any newly submitted evidence by claimants or their experts and hears argument and testimony. There is little risk of error in that process-which is even further backstopped by judicial review.
Plaintiffs attempt to inject a specter of unpalatable error by citing the risk that outcome-determinative evidence might be wrongfully excluded in any given case. But that risk is practically nonexistent, and not at all improved by the evidentiary hearing sought. First, by regulation the excluded reports are of such little probative value that they could be outcome-determinative in only the rarest of cases. Second, the standard for excluding evidence-a mere "reason to believe" fraud was involved-is nearly irrebuttable. The rare cases do not dictate the amount of process constitutionally due. Considering the robust procedural safeguards in place, plaintiffs are not constitutionally entitled to additional, burdensome process with little real-world value.
In general, due process does not guarantee a right to present evidence of whatever type and in whatever form a party chooses. Even in the context of a criminal trial, a "defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions." United States v. Scheffer , 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998). The right to present evidence must accommodate other legitimate interests, and in determining that balance, federal rulemakers enjoy broad latitude under the Constitution. See id.
*822 Here, Congress and the Commissioner balanced plaintiffs' right to introduce evidence with other legitimate interests of ensuring accurate redeterminations based on reliable evidence and facilitating swift, efficient redeterminations in cases of large-scale frauds. In doing so, the federal rulemakers created a blanket prohibition of evidence that the Commissioner or Inspector General has reason to believe is fraudulent and thus unreliable, rather than allow for case-by-case reliability determinations that would be costly and time intensive. To square that prohibition with plaintiffs' right to introduce evidence, the process allows plaintiffs to submit new evidence to substitute for that which was excluded. That approach soundly balances the Mathews factors.
Indeed, the evidentiary restriction here is very much like the prohibition of polygraph evidence upheld in Scheffer . There, the Court held that a blanket prohibition on the use of polygraph evidence in military trials was reasonable because there was no scientific consensus on the general reliability of that evidence and because case-by-case reliability determinations would be difficult, if not unworkable. See Scheffer , 523 U.S. at 310-11, 118 S.Ct. 1261. Rather than allow individual defendants to litigate why their polygraph evidence was nonetheless reliable, it was reasonable to exclude that sort of evidence as a matter of course.
Scheffer is not distinguishable on the theory that the restriction here depends on a particularized determination that aspects of the plaintiffs' records are tainted by fraud, whereas Scheffer involved a blanket prohibition. Such a purported distinction mistakes the nature of the Inspector General's inquiry and the standard for exclusion. The Inspector General developed the necessary "reason to believe" not by engaging in a hyper-particularized analysis of each plaintiff's records but by investigating and uncovering that the four doctors conspired with Conn to submit fraudulent reports. The Commissioner then excluded any reports submitted by one of those doctors at the behest of Conn. The only remotely individualized inquiry was to compile the list of claimants who submitted one of those reports-hardly an exercise requiring adversarial input. In overall function, then, the exclusion here works just like Scheffer's blanket prohibition.
It similarly misses the point to argue, in response, that the evidentiary restriction is unreasonable because it may exclude some evidence that was not fraudulent. Congress is free to (reasonably) exclude-in all cases -categories of evidence that it determines is inherently unreliable, even if that evidence might be trustworthy in some cases. The point is that it is too difficult or time consuming to determine when those cases arise. The Social Security benefits regime incorporates a good example of the principle: by statute, claimants can prove their disability only with evidence incorporating "medically acceptable clinical and laboratory diagnostic techniques." See 42 U.S.C. § 423(d)(3). That limitation reflects a policy choice that it is preferable to demand a certain quality of evidence than to determine case by case whether a claimant's non-qualifying testimony is credible. The idea that some accurate, non-qualifying evidence will not be considered is baked into that evidentiary restriction. So too here. Even if some of the excluded reports contain bits of accurate information, Congress has decided that it is better to exclude all of the tainted evidence than to engage in the hard, if not impossible, work of confidently determining which portions are good evidence and which are bad. There is nothing unreasonable-or unconstitutional-about that decision.
*823 In short, a Mathews v. Eldridge balancing leads inexorably to the conclusion that there is no procedural due process violation in this case. Disregarding in this case the countless Supreme Court holdings that reaffirm Mathews v. Eldridge risks undermining public respect not only for the integrity of the Social Security system, but also for the commitment of the lower courts to follow foundational Supreme Court precedent.
II.
The Commissioner's redetermination process also survives the two challenges plaintiffs advance under the Administrative Procedure Act. First, plaintiffs argue that the hearings afforded during redeterminations do not live up to the standards of formal adjudications under the APA. That is a non-starter because redeterminations are not formal adjudications under the APA and thus need not meet those requirements. Regardless of whether they must meet those standards, they do.
Second, plaintiffs argue that it is arbitrary and capricious for the Commissioner to allow claimants an opportunity to challenge a "reason to believe" finding by the Commissioner, but not one by the Inspector General or another law-enforcement agency. This too fails out of the gate; plaintiffs have forfeited the argument by not developing it below. In any event, because the Commissioner has a non-arbitrary justification for tailoring the procedures according to the genesis of the "reason to believe" finding, those procedures are not arbitrary or capricious.
A.
Redeterminations are not formal agency adjudications under the APA and thus need not follow the detailed trial-like procedures the APA requires of formal adjudications. A formal adjudication is an agency adjudication that is statutorily required to be determined "on the record after opportunity for an agency hearing." See 5 U.S.C. § 554(a). The statutory language governing redeterminations, subsection 405(u), contains no "on the record" requirement. See 42 U.S.C. § 405(u)(1)(A). When there is reason to believe that fraud was involved in a benefits claim, § 405(u) requires the Commissioner to "immediately redetermine the entitlement of individuals" and authorizes the Commissioner to "terminate such entitlement" if the "Commissioner of Social Security determines that there is insufficient evidence to support such entitlement" "after redetermining pursuant to this subsection." § 405(u)(1)(A), (3). That statutory language is silent as to what procedural shape redeterminations shall take.
With no "on the record" requirement in § 405(u) -the only statutory language expressly governing redeterminations-plaintiffs are forced to look elsewhere in search of their textual hook. According to plaintiffs, the necessary "on the record" requirement appears in § 405(b)(1), which governs the Commissioner's "decisions as to the rights of any individual applying for a payment under this subchapter." They argue that § 405(b)(1) compels an "on the record" hearing and applies to redeterminations under § 405(u). Both steps of that syllogism are shaky.
Contrary to plaintiffs' contention, we have not already held that hearings under § 405(b)(1) are formal adjudications. See Mullen v. Bowen , 800 F.2d 535, 536-37 & n.1 (6th Cir. 1986) (en banc). While we did say as much in a footnote in Mullen , we did so only in dicta. The issue of whether § 405(b)(1) required an "on the record" hearing was not before us then. The Commissioner does not appear to contest this point on appeal, however.
*824 Even assuming § 405(b)(1) determinations are formal adjudications, that subsection does not govern redeterminations under § 405(u).[8] Section 405(b)(1) governs "decisions as to the rights of any individual applying for a payment under this subchapter." But plaintiffs were not "individual[s] applying for a payment" at the time of their redeterminations; they were recipients. Section 405(u), on the other hand, authorizes the Commissioner to redetermine disability "pursuant to this subsection," meaning § 405(u), without any indication that redeterminations are also subject to § 405(b)(1). Plaintiffs' broader reading fails to account for these textual limitations.
Reading formal-adjudication requirements into § 405(u) would subvert Congress's purpose in amending the statute to authorize streamlined redeterminations in cases of possible fraud. Even before the statute was amended to provide for redeterminations, the Commissioner was authorized to "reconsider" whether a recipient's disability had ceased, was no longer disabling, or ever existed to begin with-but "only after opportunity for an evidentiary hearing" that is "reasonably accessible" to the recipient. See § 405(b)(2)(B). It was this reconsideration process that Congress found "cumbersome and unworkable" in dealing with potential frauds. See Staff of Subcomm. on Oversight of the H. Comm. on Ways & Means, 103rd Cong., Rep. on Reforms to Address Supplemental Security Income Fraud and Abuse Involving Middlemen 7 (Comm. Print 1994). The very essence of § 405(u) was to provide the Commissioner a quicker, more effective method of redetermining eligibility in cases of possible fraud. It makes no sense that Congress would supplement the existing unworkable procedures with a redetermination process subject to the same procedural hurdles. That reading would render Congress's 1994 addition of the redetermination process meaningless. The better reading is that redeterminations are not subject to the APA's trial-like requirements for formal adjudications.
In any event, the redeterminations here met those requirements. Plaintiffs fault the Commissioner for (1) imposing a "sanction" based on evidence outside the record, 5 U.S.C. § 556(d) ; (2) not allowing "such cross-examination as may be required for a full and true disclosure of the facts," id. ; (3) relying on official notice of a material fact not appearing in the record without providing plaintiffs the opportunity to "show the contrary" of that material fact, see § 556(e) ; and (4) permitting agency employees involved in "investigative or prosecuting functions" to "participate or advise in the [administrative] decision," § 554(d). But each of those complaints fails for much the same analytical reason that plaintiffs' due process challenge fails: each assumes a right to challenge the Inspector General's "reason to believe" finding or conflates that finding with the administrative decision at issue-redetermination of entitlement.
First, the very same rule that prohibits an agency from imposing a "sanction" based on evidence outside the record, requires that the "agency as a matter of policy shall provide for the exclusion of irrelevant, immaterial, or unduly repetitious evidence." See 5 U.S.C. § 556(d). In *825 accordance with those rules and Congress's specific mandate in 42 U.S.C. § 405(u)(1)(B), the tainted evidence was excluded from the record on which the agency terminated plaintiffs' benefits. Thus, even if the termination of benefits can be termed a "sanction," the termination was imposed consistent with § 556(d), because it was based on "consideration of the whole record" before the administrative law judge.
Second, § 556(d) requires cross-examination only "as may be required for a full and true disclosure of the facts," and expressly allows an agency, when "determining claims for money or benefits," to accept only written evidence so long as no party is prejudiced. Plaintiffs do not claim that cross-examination was necessary for a full and true disclosure of the facts concerning the redetermination of their eligibility; they seek to cross-examine the Inspector General about its fraud finding. But plaintiffs are not entitled to any hearing on the Inspector General's finding, much less a formal adjudication, and cross-examination on that finding has nothing to do with a full and true disclosure of the facts considered by the agency in redetermining plaintiffs' eligibility.
Third, the agency did not rest its redetermination on official notice of any material fact not in the record.[9] To say otherwise is yet again to conflate the Inspector General's finding of fraud with the Commissioner's redetermination of eligibility. The agency did not take notice of the Inspector General's finding of fraud in weighing the evidence properly before it. Upon the Inspector General's referral, the tainted evidence was excluded entirely and automatically by statute. The agency's redetermination of eligibility was based on the record before it, which was completely available to plaintiffs.
Fourth, no one from the Inspector General's office participated or advised in the "[administrative] decision" to which plaintiffs would apply the formal-adjudication rules, the redetermination of eligibility. See 5 U.S.C. § 554(d). At the risk of sounding like a broken record, the administrative decision at issue is the redetermination of plaintiffs' eligibility for benefits, which was decided based on the record before the administrative law judge without any participation or advice from the Inspector General. The Inspector General's referral to the Commissioner for independent redeterminations in no way implicates the concerns underlying § 554(d) -the joining of prosecutor and judge.
B.
Plaintiffs' remaining APA claim also fails. It is neither arbitrary nor capricious for the Commissioner to shape the agency's internal procedures governing redeterminations according to which entity investigates and finds that there is "reason to believe" fraud was involved in an application. Plaintiffs do not argue that the Commissioner lacks the statutory power to *826 establish procedures to carry out redeterminations. Nor could they, for the statute says nothing about the procedures for redeterminations, see 42 U.S.C. § 405(u), and instead empowers the Commissioner to "establish procedures, not inconsistent with the provisions of this subchapter, which are necessary or appropriate to carry out such provisions," see § 405(a). It is a "very basic tenet of administrative law that agencies should be free to fashion their own rules of procedure." See Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc. , 435 U.S. 519, 543, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). Thus, as plaintiffs appear to concede, so long as the Commissioner has a non-arbitrary justification for tailoring the procedures according to the source of the "reason to believe" determination, those procedures survive challenge. Here, such a justification exists: investigations and referrals by the Inspector General-the law-enforcement component deputized to root out benefits frauds-are sufficiently different from ad-hoc findings by the Commissioner or her staff to warrant differing procedural review.
But that puts the cart before the horse. Plaintiffs forfeited their arbitrary-and-capricious challenge by failing to raise it meaningfully below. At most, plaintiffs made two passing references to the so-called arbitrary procedural distinction the Commissioner drew between Inspector General referrals and internal determinations of fraud. That these perfunctory references cite the statute setting out the arbitrary-and-capricious standard does not make up for plaintiffs' failure to develop these arguments as standalone claims. On the contrary, both references were made in support of other claims-once in the context of plaintiffs' due process challenge, and again in connection with their formal-adjudications argument. Issues cursorily mentioned without any sort of developed argument are routinely deemed forfeited. See, e.g. , Langley v. Daimler Chrysler Corp. , 502 F.3d 475, 483 (6th Cir. 2007). Plaintiffs give no reason to look past that forfeiture.
Forfeited or not, the challenge fails. The statute makes perfectly clear that the Commissioner is authorized to establish procedures that it deems appropriate for carrying out the redeterminations. See 42 U.S.C. § 405(a). That "delegated power, of course, may not be exercised arbitrarily, but its exercise may not be impeached merely because reasonable minds differ on the wisdom" of a given procedure. See F.C.C. v. Schreiber , 381 U.S. 279, 292, 85 S.Ct. 1459, 14 L.Ed.2d 383 (1965). Thus, our task is to ask whether the Commissioner has some non-arbitrary reason for establishing the two sets of procedures, not to weigh for ourselves the competing considerations that went into that decision.
The Commissioner does have a non-arbitrary justification for treating referrals from the Inspector General differently than fraud determinations made by non-investigatory, in-house personnel-namely, the distinct roles and competencies of those decisionmakers. For one, it would impose a significantly greater burden on investigators (than on agency staff or adjudicators) to subject them to countless evidentiary hearings. In part this is because the Inspector General and other law-enforcement officials play no ongoing role in redeterminations after their referral. Thus, to hold evidentiary hearings into their determinations would be to introduce a host of new actors into the redetermination process. And since the Inspector General and law-enforcement agencies are more likely to investigate large-scale frauds, the resulting hearings would often be more complicated and arduous. That is because an understanding of the broader investigation and findings is crucial to reviewing the *827 individual fraud determinations. It makes good sense that the Commissioner would choose not to impose these burdens on the Inspector General, where doing so would divert considerable resources away from the office's statutory mission to investigate and detect benefits fraud.
In contrast, it is also reasonable for the Commissioner to align redetermination procedures following its own findings of fraud with the procedures required for initial determinations under § 405(b)(1). By its terms, § 405(b)(1) governs initial determinations and not redeterminations. But that does not mean the Commissioner acts arbitrarily by fashioning redetermination procedures that borrow from those used in initial determinations. Because § 405(b)(1) provides for review of the Commissioner's decisions-but not the Inspector General's-it makes sense that redetermination procedures would allow for review of the Commissioner's finding of fraud, but not one by another entity.
It is ironic that plaintiffs fault the agency for providing review of its own findings of fault, when that review is merely a substitute for the check that is inherent in Inspector General referrals-a finding of fault by an independent third party. As discussed earlier, the Supreme Court has held that a finding of probable fault by an independent body demonstrates that a resulting deprivation is not arbitrary, "baseless[,] or unwarranted." See Gilbert v. Homar , 520 U.S. 924, 934, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997) ; see also F.D.I.C. v. Mallen , 486 U.S. 230, 244-45, 108 S.Ct. 1780, 100 L.Ed.2d 265 (1988). Thus, plaintiffs benefited from a procedural protection that claimants whose "reason to believe" determination was made by the Commissioner were not afforded. If anything, then, the ability to review the Commissioner's finding levels the procedural protections afforded to each set of claimants.
Far from arbitrary, the Commissioner's procedural choices are reasonable and further rather than hinder the congressional mandate to detect benefits fraud and terminate improper awards more efficiently and effectively.
III.
I join Part II.C. of the majority opinion, but otherwise dissent. The agency's actions challenged in this case do not violate procedural due process or the Administrative Procedure Act.

See the following cases where the Supreme Court applied Mathews v. Eldridge balancing: Nelson v. Colorado , --- U.S. ----, 137 S.Ct. 1249, 1255-58, 197 L.Ed.2d 611 (2017) ; Turner v. Rogers , 564 U.S. 431, 444-49, 131 S.Ct. 2507, 180 L.Ed.2d 452 (2011) ; Wilkinson v. Austin , 545 U.S. 209, 224-30, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005) ; Hamdi v. Rumsfeld , 542 U.S. 507, 529-35, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) ; City of Los Angeles v. David , 538 U.S. 715, 716-19, 123 S.Ct. 1895, 155 L.Ed.2d 946 (2003) (per curiam); Gilbert v. Homar , 520 U.S. 924, 931-34, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997) ; Heller v. Doe by Doe , 509 U.S. 312, 330-34, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) ; United States v. James Daniel Good Real Prop. , 510 U.S. 43, 53-59, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993) ; Connecticut v. Doehr , 501 U.S. 1, 10-18, 111 S.Ct. 2105, 115 L.Ed.2d 1 (1991) ; Washington v. Harper , 494 U.S. 210, 229-36, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) ; Walters v. Nat'l Ass'n of Radiation Survivors , 473 U.S. 305, 320-34, 105 S.Ct. 3180, 87 L.Ed.2d 220 (1985) ; Ake v. Oklahoma , 470 U.S. 68, 77-83, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) ; Cleveland Bd. of Educ. v. Loudermill , 470 U.S. 532, 542-48, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) ; Illinois v. Batchelder , 463 U.S. 1112, 1116-19, 103 S.Ct. 3513, 77 L.Ed.2d 1267 (1983) ; Hewitt v. Helms , 459 U.S. 460, 473-77, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983) ; Santosky v. Kramer , 455 U.S. 745, 758-70, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) ; Schweiker v. McClure , 456 U.S. 188, 193-200, 102 S.Ct. 1665, 72 L.Ed.2d 1 (1982) ; Lassiter v. Dep't of Social Servs. , 452 U.S. 18, 27-34, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) ; Little v. Streater , 452 U.S. 1, 13-17, 101 S.Ct. 2202, 68 L.Ed.2d 627 (1981) ; United States v. Raddatz , 447 U.S. 667, 677-81, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980) ; Addington v. Texas , 441 U.S. 418, 425-33, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) ; Mackey v. Montrym , 443 U.S. 1, 10-19, 99 S.Ct. 2612, 61 L.Ed.2d 321 (1979) ; Parham v. J.R. , 442 U.S. 584, 599-617, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979) ; Memphis Light, Gas & Water Div. v. Craft , 436 U.S. 1, 17-21, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978) ; Dixon v. Love , 431 U.S. 105, 112-115, 97 S.Ct. 1723, 52 L.Ed.2d 172 (1977) ; Ingraham v. Wright , 430 U.S. 651, 675-83, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977).
Against this phalanx of cases, plaintiffs cite Dusenbery v. United States , 534 U.S. 161, 122 S.Ct. 694, 151 L.Ed.2d 597 (2002), which accepted the Government's suggestion that the Court decide an issue of adequate notice under the longstanding reasonableness framework of Mullane v. Central Hanover Bank & Trust Co. , 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), rather than Mathews . Dusenbery is totally inapposite; there is no question that plaintiffs in this case had adequate notice of the asserted property interest deprivation.

According to plaintiffs' brief, they "are not requesting an opportunity to challenge the factual basis for OIG's overall investigation, i.e., its claim that Conn committed a general fraud."

This point is not answered by the analogy the majority draws to a hypothetical variation of the Hamdi facts. The present case is not analogous to allowing Hamdi the hollow opportunity to contest his ultimate status as an "enemy combatant" but not the underlying fact that he was captured on the battlefield in Afghanistan (a fact all but dispositive of the ultimate question). Apples to apples, the evidentiary exclusion here is like allowing Hamdi a very real and meaningful opportunity to contest before a neutral arbiter his status as an enemy combatant and that he was captured on the battlefield in Afghanistan (and any other fact used to justify his detention)-only requiring that he do so without relying on, say, letters from persons the CIA has reason to believe are affiliated with al-Qaeda, because Congress determined that evidence of that kind is categorically unreliable in determining enemy combatant status.

One plaintiff, Griffith, experienced no gap in her monthly payments because of the timing of her overpayment waiver and successful new application.

Departing from the standard analysis for procedural due process also risks the incoherent anomaly of looking at the sought procedural protection as the property interest. The property interest in this case, for instance, is the eligible receipt of disability benefits, not the desired procedural protection of permitting evidence from identified fraudsters. Admitting the evidence is instead a proposed procedure asserted to be required under the Mathews v. Eldridge balance to protect the property interest in disability benefits. Treating admission of the evidence itself as the protected property interest facilitates unsound reliance on cases like Goldberg and Hamdi that involved property and liberty interests far weightier than those in Eldridge and this case. For this reason, the purported analogies in the rhetorical opening to the Hicks opinion below, concerning terrorists and lying employees, are false ones. See Hicks , 214 F.Supp.3d at 630.

It is not at all contradictory to say that the Inspector General's "reason to believe" finding is easily and reliably made and yet burdensome to testify about at individualized hearings. The plaintiff-specific findings are reliably made, in part, because they are deduced from the broader investigation into and discovery of the pattern of submitting fraudulent forms of a particular kind. But that also means that the Inspector General would have to present evidence of the broader conspiracy (from which the individualized findings are deduced) to substantiate the specific application of that broader evidence in each and every case.

The majority argues that the risk of erroneous deprivation is too high in these cases because the Commissioner excluded more evidence than the Inspector General had reason to believe was fraudulent. But that is not quite right. In its referral, the Inspector General notified the Commissioner of its reason to believe that "Mr. Conn or his firm submitted pre-completed 'template' Residual Functional Capacity forms purportedly from" one of the four identified doctors. Along with each of those RFC forms, Conn submitted the evaluation notes of those doctors purporting to be the basis for the (fabricated) conclusions in the RFC forms. Thus, based on the referral, the Commissioner excluded these RFC forms and the accompanying examination notes, which together formed a medical report or opinion. It makes no sense to suggest that the Inspector General did not have reason to believe that the evaluation notes submitted along with and serving as the basis of the conclusions contained in the fabricated RFC forms were similarly tainted by fraud.

The Commissioner does argue the point that redeterminations under § 405(u) are not required by § 405(b)(1), see Comm'r. Reply at 36-37, quoting Robertson v. Berryhill , No. 16-cv-3846, 2017 WL 1170873, at *12 & n.13 (S.D.W. Va. Mar. 28, 2017), for the proposition that no hearing is "mandated by the specific section regarding redeterminations," § 405(u), but that the "redetermination process as implemented by the [agency] nonetheless provides the protections guaranteed by § 405(b)(1)."

Our 1992 order in Baker v. Director, Office of Workers' Compensation Programs , 980 F.2d 729, 1992 WL 361287, at *2 (6th Cir. 1992) (order), is not to the contrary. In Baker , we remanded an unfavorable (original) benefits determination because the administrative law judge considered but assigned almost no weight to a medical opinion after deeming the authoring doctor's qualifications unsuitable. See id. That was a problem because the record contained no evidence whatsoever of those qualifications. See id. Thus, in effect, the ALJ took official notice of non-record facts-the doctor's qualifications-that were material to its decision not to award disability benefits. Here, the ALJ took official notice of nothing because the excluded evidence was never before the ALJ. Unlike in Baker , the ALJ did not weigh the reports in question; the decision to exclude the reports was required by statute to maintain the integrity of the substantive decisionmaking process.