# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Karen Guss, : 
     Appellant : 
          :
     v. : 
          :
City of Philadelphia Board of :  No. 46 C.D. 2019
Pensions and Retirement :  Submitted: June 12, 2020


BEFORE: HONORABLE ANNE E. COVEY, Judge
     HONORABLE CHRISTINE FIZZANO CANNON, Judge
     HONORABLE J. ANDREW CROMPTON, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY        FILED: July 6, 2020

    Karen Guss (Guss) appeals, pro se, from the Philadelphia County Common Pleas Court's (trial court) December 3, 2018 order denying her appeal from the City of Philadelphia (City) Board of Pensions and Retirement's (Board) January 25, 2018 decision. Guss presents three issues for this Court's review: (1) whether the trial court erred when it denied Guss's appeal because the Board enforced a deadline against Guss without notice and contrary to legislative intent that employees receive actual notice; (2) whether the trial court erred by holding that the Board's attempt to notify Guss met due process requirements; and (3) whether the trial court erred by holding that the Board's findings were based on substantial evidence. After review, we affirm.

    The City employed Guss as an Assistant City Solicitor from 2001 to 2005. *See* Findings of the Board, August 31, 2018, Board Finding of Fact (FOF) No. 3. Guss was a member of Pension Plan Y during her employment. *See id*. Guss left City employment on July 30, 2005. *See* FOF No. 14. By August 26, 2005 letter, the

Board advised Guss that she could pay monies to finalize her purchase of service credit to vest in Plan Y. *See* FOF No. 14. Guss did not respond to the letter. *Id.* By October 25, 2005 letter, the Board explained Guss's options given that Guss was separated from City employment. *See* FOF No. 16. The Board informed Guss that she could withdraw her contributions or leave them in the retirement system until she reached retirement age. *See* FOF No. 16. In November 2005, having received no response to its earlier letters, the Board sent Guss a third letter informing her she could withdraw her contributions by completing the form enclosed with the letter. *See* FOF No. 17. The letter notified Guss that she could withdraw her pension contributions but, if she did, she may not be able to reenter Plan Y at a later date. *See id.* Guss returned the necessary forms withdrawing her contributions. *See* FOF No. 18.

On January 19, 2016, Guss rejoined City employment and, because she had withdrawn her pension contributions, pursuant to Sections 22-104(2), 22-201(2) and (5) and 22-203(1)(a) of the Philadelphia Public Employees Retirement Code (Code),[1] she was immediately placed in Plan 10 rather than Plan Y. *See* FOF Nos. 20, 22. Pursuant to Section 22-201(5) of the Code, returning employees have the opportunity to opt out of Plan 10 and into Plan Y within 30 days of employment, but the Code does not explicitly require that employees be notified of that option.

---

[1] Phila. Pub. Employees Ret. Code §§ 22-104(2), 22-201(2), (5), 22-203(1)(a).

All references [to the Code, herein,] are taken from the published version of the Philadelphia Code available at the time of Guss's rehire[,] Philadelphia Code, 11th ed., 2016 ('This Eleventh Edition of the Philadelphia Code includes all ordinances passed by Council through the end of its 2012-2015 term and is current through March 2016.'), as this is the version of the Code Guss relied upon in making her argument regarding her understanding of her membership in Plan Y[.]

FOF No. 1, n.2.

Notwithstanding, on March 22, 2016, the Board sent three items to Guss's home address of record. *See* FOF No. 23. The first item was a cover letter and packet describing the varying pension plans (Plan Packet). *See id.* The cover letter was entitled "IMPORTANT PENSION MEMBERSHIP INFORMATION," and informed Guss that, "[i]n the near future you will receive a Summary Plan Description for your reference in which various benefits of your plan [are] explained. For more detailed information, or to view the full [Code], please visit us at [phila.gov_website]." FOF No. 24; Reproduced Record (R.R.) at 14a (Cover Letter). The enclosed Plan Packet was titled "Plan 87," and the words "Municipal Plan Y, Elected Plan L, Police Plan B, Fire Plan A" appeared in the lower left corner. R.R. at 28a. The first page of the Plan Packet described Plan Y as covering "All Civil Service-Exempt, Appointed, and Non-represented employees . . . hired or rehired after January 8, 1987." R.R. at 29a. The other two items the Board mailed on March 22, 2016 (one sent by certified mail, the other by First-Class Mail to her home address) were copies of the same letter containing a summary plan description informing Guss that she was in Plan 10, and offering her the opportunity to opt out of Plan 10 and into Plan Y within 30 days of the letter's mailing date. *See* R.R. at 15a (Opt-Out Letter). Guss did not opt out of Plan 10 or otherwise respond to the Opt-Out Letter.

In January 2017, Guss contacted the Board requesting information about purchasing prior years of public service. *See* FOF No. 29. In its response, the Board referenced that Guss was in Plan 10. *See id.* On January 4, 2017, Guss responded indicating that she wished to appeal from her placement in Plan 10, claiming she had been previously unaware she was in Plan 10. *See* FOF No. 30. On January 4, 2017, the Board administratively denied Guss's request to switch from Plan 10 to Plan Y. *See* FOF No. 32. By January 30, 2017 letter, Guss appealed to the Board from the Board's administrative denial. *See* FOF No. 34. In her appeal letter, Guss explained that she had no notice she would be placed in Plan 10 and that she believed she was

3

in Plan Y. *See* FOF No. 35. Guss acknowledged receipt of the Plan Packet sent to her home address, but denied she had received the Opt-Out Letter sent to the same address. *See* FOF No. 36.

On February 27, 2017, the Board notified Guss that it had denied her request to opt into Plan Y because she had not opted out of Plan 10 within 30 days of the March 22, 2016 letter's mailing date. *See* FOF No. 38. Guss appealed from the Board's decision and a hearing was held on October 11, 2017. *See* FOF Nos. 39, 44.

At the hearing, Guss admitted receiving the Plan Packet and accompanying letter, but claimed she did not receive the Opt-Out Letter either by First-Class Mail or certified mail. *See* FOF No. 57. She explained that, based upon her reading of the Code, she believed she was in Plan Y. *See* FOF No. 49. Guss also stated that her paystub had the notation "Y10," which she assumed meant she was in Plan Y. *See* FOF No. 56.

A Board employee credibly testified regarding the mailings and the Board's mailing process. *See* FOF No. 78. He stated that the Board had mailed the Plan Packet and two copies of the Opt-Out Letter (sent by First-Class and certified mail). *See* FOF Nos. 58-59. The Board offered the United States (U.S.) Postal Service tracking information for the Opt-Out Letter sent by certified mail, reflecting that notice to pick up the certified letter had been left at Guss's home. *See* FOF No. 60. On January 25, 2018, the Board denied Guss's appeal, determining that both the Plan Packet and the Opt-Out Letter were delivered by First-Class Mail, and the certified mail copy of the Opt-Out Letter was delivered, but Guss did not pick it up. *See* FOF Nos. 79-81. Further, the Board found Guss not to be credible. *See* FOF No. 77. The Board also found that Guss was familiar with Board procedures and Code requirements and, in the past, had failed to timely respond to time-sensitive documents. *See* FOF Nos. 85-86. In addition, the Board found that Guss had read and understood the November 2005 letter informing her that, if she withdrew her

4

pension contributions, she might not be in the same plan if she was rehired. *See* FOF No. 87. The Board also found that Guss, as an attorney with previous City employment, had "substantial knowledge of the [] Code, and an understanding of the opt[-]out requirement included therein." FOF Nos. 89-90. Based thereon, the Board denied Guss's appeal. Guss appealed to the trial court, which affirmed the Board's decision. Guss appealed to this Court.[2]

Initially, when the City hired Guss in 2016, Section 22-104(2) of the Code stated, in pertinent part:

> Plan Y includes all current and former municipal employees of the City [that is, those] who are not members of Plan A, Plan B, [or] Plan [J as defined in this Section,] who are appointed on or after January 8, 1987. Plan Y is a plan within Municipal Division New.
>
> **Plan 10 includes (i) certain employees hired or rehired on or after January 1, 2010, subject to election under Section 22-201(5) [of the Code]; and (ii) certain electing employees; all as set forth in [Sections] 22-201(5) and []22-206 [of the Code].**

Code § 22-104(2) (emphasis added).

> Section 22-201 of the Code provided:
>
> (2) *Employees first hired on or after January 8, 1987.* All employees who are hired, rehired, or first elected on or after January 8, 1987, shall be members of Plan A, Plan B, Plan L, or Plan Y of the Retirement System, except to the extent that they are afforded other options pursuant to [Section] 22-203 [of the Code] (Membership After Reemployment) or are Police or Fire employees covered by subsection (3) or (5), **or are municipal employees covered by subsection** (4) or **(5)**, or are elected officials covered by subsection (5). Of these employees:

---

[2] "Our scope of review is limited to determining whether the Board violated any constitutional rights, whether its decision was in accordance with the law, or whether its findings of fact were not supported by substantial evidence." *Hinkle v. City of Phila.*, 881 A.2d 22, 24 n.3 (Pa. Cmwlth. 2005).

(a)  All Municipal Employees are members of Plan Y which covers members of the Municipal Division New as soon as they are employed by the City . . . .

. . . .

(5) Employees [first] hired or assuming elected office on or after January 1, 2010.  All employees who

. . . .

(d)  are municipal employees not represented by a union or are elected officials;

and who

. . . .

(ii) **are hired or rehired or first elected** [**on or after the date**] **set out below are members of Plan 10 immediately upon employment by the City or upon taking office**, except to the extent that they are afforded other options pursuant to [Section] 22-203 [of the Code] (Membership After Reemployment) or **unless, within thirty (30) days of employment, the employee** (except an employee who either (.1) is represented by Lodge No. 5 of the [Fraternal Order of Police] and is an employee of the Register of Wills or (.2) is a guard represented by [AFSCME District Council 33]) **makes an irrevocable election to become a member of Plan A or B or Y or L, as applicable**.

Code § 22-201 (emphasis added).[3]

Guss first argues that the Board improperly enforced a 30-day deadline against her without notice and contrary to **legislative intent that employees receive**

---

[3] Section 22-203(1)(a) of the Code stated, in relevant part:

(1) Reemployment on or after January 8, 1987.

(a) Except as provided in paragraph (b) of this subsection, all separated employees who become reemployed by the City on or after January 8, 1987 become subject to the provisions of Plan A, Plan B, Plan L, Plan Y, [or] Plan 10.

Code § 22-203(1)(a).

6

**actual notice** prior to the running of the 30-day response period.[4]  Specifically, Guss contends:

> [T]he [Code] provide[s] in relevant part that new or rehired employees . . . are members of Plan 10 immediately upon employment by the City . . . unless, within thirty (30) days of employment, the employee . . . makes an irrevocable election to become a member of . . . Plan Y.  [] Code § [] 22-201(2)(a)(5)(ii).  Giving meaning, as the principles of statutory construction require, to each word in the provision, it is immediately apparent that the 30 days begin 'at employment' because 'at employment' is when City employees are typically given information about their benefits and benefit options.  **The intent of the [Code] is that employees have notice of the opportunity and of the timeframe for availing themselves of it; the bill does not contemplate a scenario in which the 30[-]day window for electing Plan Y is slammed shut without an employee ever having known it was open**.

Guss Br. at 15-16 (emphasis added).  Guss expounds:

> There is no statute or regulation establishing, or even providing notice of, the Board's substitution of mailing for actual notice at employment and of the draconian consequences the Board imposed on employees unfortunate enough not to receive their mail.

> The Board acted without authority and contrary to law when it overrode [Guss's] opportunity, granted by ordinance, to choose a pension plan **within 30 days of receiving actual notice at employment**, and instead substituted its own deadline of 30-days from a randomly-timed and unreceived mailing[].

---

[4] Because Guss did not raise the issue of whether the Board properly determined that she was in Plan 10 in the Statement of the Questions Involved portion of her brief to this Court, that issue is waived.  *See Metrick v. Civil Serv. Comm'n*, 687 A.2d 26 (Pa. Cmwlth. 1996) (issues not raised in an appellant's statement of questions involved or fairly suggested thereby are waived on appeal).

7

Guss Br. at 18 (emphasis added). Guss does not point to any language requiring the Board to provide actual notice of the 30-day election window. In fact, there is no Code language requiring such notification.

In *Cardella v. Public School Employees' Retirement Board*, 827 A.2d 1277 (Pa. Cmwlth. 2003), this Court addressed an administrative body's notification obligations where, as in the instant matter, the relevant statute did not contain an actual notice requirement:

> With regard to this notice issue, several recent cases are important. In *Higgins v. Public School Employes' Retirement System*, 736 A.2d 745 (Pa. Cmwlth. 1999), this Court held that where a section of the [Public School Employees'] Retirement Code [(Retirement Code), 24 Pa.C.S. §§ 8101-8535,] mandated that newly hired employees be given notice within [30] days of beginning employment of their option to elect 'multiple service', thereby enabling the employee to receive credit for prior state employment, notice by [F]irst[-C]lass [M]ail to the employee's last know[n] address was required. Because the employee was never provided with this proper notice, we reversed the order of the [Public School Employees' Retirement] Board [(School Retirement Board)] and ordered that the employee be granted multiple service membership in the retirement system. However, in *Trakes v. Public School Employes' Retirement System*, 768 A.2d 357 (Pa. Cmwlth. 2001), . . . we distinguished *Higgins*. In *Trakes*, the employee argued that the [School Retirement] Board erroneously denied her benefits application because she was not given proper notice of the requirement to apply for disability benefits while she was classified as an inactive member during the statutory two-year period. The employee cited *Higgins* for the proposition that [the Pennsylvania Public School Employees' Retirement System (PSERS)] was required to provide her with notice by [F]irst[-C]lass [M]ail. In rejecting the employee's argument, we held that[]

>> we agree with the Board that *Higgins* is distinguishable from the situation in [the claimant's] case. *Higgins* involved a specific

8

provision of the Retirement Code . . . which expressly requires that PSERS notify former [State Employees' Retirement System] members of their right to elect multiple service membership upon gaining PSERS membership through public school employment. This Court concluded in *Higgins* that bulk mailings were not sufficient to comply with this specific statutory requirement to notify members of their right to elect multiple service. **The Retirement Code does not contain an equivalent provision requiring that PSERS specifically notify its members of the two-year restriction on their inactive member status as set forth in [Section 8102 of the Retirement Code, 24 Pa.C.S. § 8102]. If [the claimant's] approach were followed to its logical conclusion[,] PSERS would be required to provide separate written notice regarding each provision in the Retirement Code that could have an impact on a member's benefits. If the General Assembly had intended to require specific notice of all Retirement Code provisions impacting a member's benefits[,] it easily could have done so.** It is not for the courts to add, by interpretation, to a statute, a requirement which the General Assembly did not see fit to include. Accordingly, we conclude that the [School Retirement] Board did not err in denying [the claimant's] application for disability retirement benefits.

*Trakes*, 768 A.2d at 367.

*Cardella*, 827 A.2d at 1280-81 (emphasis added; citations omitted). The *Cardella*

Court concluded:

The case now before us deals with [a statutory section], which clearly does not contain an equivalent provision requiring that PSERS specifically notify its members of their opportunity to elect Class T-D membership. Therefore, based on our reasoning in *Trakes*, the *Higgins* case does not *require* that PSERS provide notice by [F]irst[-

9

C]lass [M]ail to its members informing them of their option to elect to become [] Class T-D members of the retirement system. However, one salient fact does distinguish this case from *Trakes*: **In this case, PSERS *elected* to provide notice by [F]irst[-C]lass [M]ail to all its members** of their option to become Class T-D members. If we would take PSERS' argument that the notice issue is irrelevant to its logical conclusion, it could willingly provide notice of important retirement benefits to certain members and not others and the members who did not receive notice would have absolutely no recourse. This result is untenable. Accordingly, we hold that in this situation, **basic principles of fairness dictate that if PSERS chooses to provide notice of retirement benefits despite not being statutorily mandated to do so, it must provide the same notice to *all* its members**.

*Cardella*, 827 A.2d at 1281-82 (bold emphasis added).

In *Higgins*, the relevant statute required notice, but did not dictate the manner in which it was to be delivered. The *Higgins* Court explained:

If a statute does not prescribe a specific type of notice, then actual **or constructive notice is required**. . . . [I]n the absence of specific statutory notice provisions, what is required of a governmental unit is that which is sufficient to provide the person to be notified with actual **or constructive notice** of his or her rights.

*Higgins*, 736 A.2d at 751 (emphasis added; citation omitted).

The claimant in *Higgins* was employed by the Pennsylvania Department of Education between 1962 and 1964 and, in 1976, became a Montgomery County Area School District employee and a PSERS member. PSERS had not enforced the election provision between 1976 and 1983. Between 1983 and 1985, PSERS implemented two grace periods allowing members to elect multiple service, and published grace period information in two newsletters. In 1995, the claimant requested information about purchasing credit for her past state service. PSERS

treated the request as a request to elect multiple service and denied the request as untimely.

On appeal, this Court explained:

[The h]earing [e]xaminer found that the timeliness requirement was not met in the instant case as admittedly there was no actual or constructive notice given to [the c]laimant upon commencing her employment at [the school district] in 1976 and that the subsequent notices via the newsletter were insufficient to constitute actual or constructive notice. PSERS argues, however, that [the c]laimant had an opportunity to elect multiple service through the grace period it offered between 1983 and 1985, that important information is transmitted via the newsletters, that members have a duty to read the newsletters, and that this opportunity corrected any failure to previously provide notice. We disagree.

While the grace period was apparently not limited to members who had not been given timely notice, its effect was to give such members a chance to receive the benefits of multiple service. What PSERS provided through the grace period was no less than what [the c]laimant asks of [the School Retirement] Board and of this Court today: an opportunity to elect multiple service and repurchase withdrawn credits.

**If [the c]laimant received actual or constructive notice of the grace period, her appeal would fail because she would have been given what the Retirement Code requires, a genuine opportunity to participate in multiple service. Her failure to follow through on this chance would have constituted a choice to decline such benefits. The Retirement Code only mandates one chance to elect multiple service. To give [the c]laimant more than one such chance would be to go beyond the Retirement Code.**

*Higgins*, 736 A.2d at 752 (emphasis added).

Here, as in *Cardella*, the relevant statute does not mandate notice. Notwithstanding, the Board elected to provide notice to its members. This Court

11

concludes that, having elected to provide notice of the 30-day window, the Board was required to provide notice to all members and, consistent with *Higgins*, could satisfy its notice obligations by actual **or constructive notice**. Accordingly, the Court rejects Guss's contention that the Code required the Board to provide Guss actual notice of her right to opt into Plan Y.[5]

Relying on *Jones v. Flowers*, 547 U.S. 220 (2006), Guss next asserts that the Board's notification efforts did not satisfy due process requirements. In *Jones*, the U.S. Supreme Court explained:

> [T]his Court has deemed notice constitutionally sufficient if it was reasonably calculated to reach the intended recipient

---

[5] In *Higgins*, this Court interpreted the relevant statutory provision to provide a conditional rather than a mandatory 30-day window from the start of employment based on consideration of the statute as a whole. Although the relevant language mandated that the employee make an election within 30 days, this Court found that, based on a separate statutory provision providing for the Board to grant multiple service after 30 days, the applicable Retirement Code section "is not operative until the initial 30[-]day period for employer to give notice has expired and the employer . . . has been given an opportunity to fail in its responsibility to provide the statutory notice." *Higgins*, 736 A.2d at 751.

Importantly, here, other than as it relates to Guss's notice argument (as described in her Statement of the Questions Involved), Guss does not challenge the Board's authority to offer the 30-day window beyond 30 days following the employment start date. Nor does she offer any legal authority with respect to that issue. "[A]n argument 'not supported by pertinent authority . . . is waived.'" *Muldrow v. Se. Pa. Transp. Auth.*, 88 A.3d 269, 274 (Pa. Cmwlth. 2014) (quoting *Eckman v. Erie Ins. Exchange*, 21 A.3d 1203, 1208 (Pa. Super. 2011)). Therefore, the issue is waived, and we shall not address whether the Board exceeded its authority in doing so.

The record evidence reflects that the Board provided Guss the same constructive notice provided to all members, by First-Class and certified mail, offering her the opportunity to opt into Plan Y within 30 days of the date of the letter. Although Guss contends she was not provided notice within 30 days of her **employment**,

> [Guss] received . . . constructive notice of the grace period, [and thus,] her appeal [must] fail because she [was] given what the [] Code requires, a genuine opportunity to [opt into Plan Y]. Her failure to follow through on this chance [] constituted a choice to decline such benefits. The [] Code only mandates one chance to [opt out of Plan 10]. To give [Guss] more than one such chance would be to go beyond the [] Code.

*Higgins*, 736 A.2d at 752.

when sent. *See, e.g., Dusenbery* [*v. U.S.*, 534 U.S. 161,] 168-169 . . . [(2002)]; *Mullane*[*v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306,] 314 [(1950)]. In each of these cases, the government attempted to provide notice and heard nothing back indicating that anything had gone awry, and we stated that '[t]he reasonableness and hence the constitutional validity of [the] chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected.' Id. at 315[.]

*Jones*, 547 U.S. at 226-27. Similarly, in *Higgins*, this Court stated:

The U.S. Supreme Court has addressed what is reasonable notice to constitute due process of law. The Supreme Court in *Mullane* held that a reasonable and, therefore constitutionally valid method for notice is a direct notice that is reasonably certain to inform those affected, or, where conditions do not reasonably permit direct notice, the form of notice chosen should be a feasible and customary method which is more likely (or at least as equally likely) to provide notice than those methods which were not chosen.

*Higgins*, 736 A.2d at 752-53 (citation omitted).

Importantly, "constitutionally adequate notice of administrative action is notice which is reasonably calculated to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. **This requirement is satisfied when notice of the action is mailed to the interested party's last known address**." *Higgins*, 736 A.2d at 753 n.15 (emphasis added; citation omitted). In the instant matter, the record evidence supports that the Board mailed the Opt-Out Letter by both First-Class and certified mail to Guss's record home address. Accordingly, this Court concludes that the Board's notification efforts satisfied due process.

Finally, Guss asserts that the Board's finding that she received the Opt-Out Letter was not based on substantial evidence. This Court has explained:

Under the mailbox rule, evidence that a letter was mailed ordinarily will be sufficient to permit a fact-finder to find that the letter was, in fact, received by the party to whom it

13

was addressed. A claimant asserting non-receipt of mail must overcome the presumption created by the common law mailbox rule.

*Douglas v. Unemployment Comp. Bd. of Review*, 151 A.3d 1188, 1191 (Pa. Cmwlth. 2016) (citation omitted).

> '[U]**nless a rule or regulation specifies otherwise, proof of** [**actual**] **mailing is not a** *requirement* **for a party to prove that a document was actually mailed**.' *C.E. v. Dep*['t] *of Pub*[.] *Welfare*, 97 A.3d 828, 833 (Pa. Cmwlth. 2014) ([italic] emphasis in original). Instead, 'when a letter has been written and signed in the usual course of business and placed in the regular place of mailing, **evidence of the custom of the establishment as to the mailing of such letters is receivable as evidence that it was duly mailed**.' *Dep*['t] *of Transp*[.] *v. Brayman Constr*[.] *Co*[*rp*].*—Bracken Constr*[.] *Co.*, . . . 513 A.2d 562, 566 ([Pa. Cmwlth.] 1986) (quoting *Christie v. Open Pantry Marts*, . . . 352 A.2d 165, 166-67 ([Pa. Super.] 1975)). '**It is well settled that the presumption in the mailbox rule is not nullified by testimony denying receipt of the item mailed**.' *Brayman Constr*[.] *Co.*, 513 A.2d at 566.

*Pinnacle Health Hosps. v. Unemployment Comp. Bd. of Review*, 210 A.3d 1127, 1131-32 (Pa. Cmwlth. 2019) (bold emphasis added).

Here, the Board's Administrative Services Supervisor Shahied Lloyd (Lloyd) described the Board's process of mailing pension correspondence. *See* R.R. at 68a. Lloyd testified that the Board scans and retains all correspondence mailed to employees. *See* R.R. at 70a. He further explained that if the post office returns regular mail as undeliverable, it is placed in the employee's file, and there was no such letter in Guss's file. *See* R.R. at 78a-79a. Lloyd stated that the three March 22, 2016 mailings (the Plan Packet and two copies of the Opt-Out Letter) had been scanned, evidencing that the Board sent them to Guss. *See* R.R. at 70a-73a. Further, the U.S. Postal Service tracking information for the Opt-Out Letter sent by certified mail was produced, reflecting that notice to pick up the certified Opt-Out Letter had

14

been left at Guss's home. *See* R.R. at 72a-73a. "As the ultimate fact finder, the Board has the authority to resolve evidentiary conflicts and to make all necessary credibility determinations." *Merlino v. Phila. Bd. of Pensions & Ret.*, 916 A.2d 1231, 1234 n.5 (Pa. Cmwlth. 2007). The Board found Lloyd's testimony was credible and, as such, established the presumption that Guss received the Opt-Out Letter. Because the Board found Guss not credible, Guss failed to rebut the presumption that she received the Opt-Out Letter.

Guss complains that the Board did not adequately explain its reasons for finding that her testimony lacked credibility. However,

> [a]n appellate court may not reweigh the evidence or make credibility determinations. [] [A]n appellate court may [only] 'overturn a credibility determination if it is arbitrary and capricious or so fundamentally dependent on a misapprehension of material facts, or so otherwise flawed, as to render it irrational.' *Agostino v. T[wp.] of Collier*, 968 A.2d 258, 263-64 (Pa. Cmwlth. 2009). A fact finder capriciously disregards evidence 'when there is a willful and deliberate disregard of competent testimony and relevant evidence which one of ordinary intelligence could not possibly have avoided in reaching a result.' *Id.* at 264 (quoting *Arena v. Packaging Sys[.] Corp[.]*, . . . 507 A.2d 18, 20 ([Pa.] 1986)).

*Spencer v. City of Reading Charter Bd.*, 97 A.3d 834, 842 (Pa. Cmwlth. 2014) (citation and footnote omitted). "In addition, where the fact finder has not observed the witness testify and cannot assess witness demeanor, a mere conclusion on credibility is inadequate; the fact finder must explain the reasoning for the determination." *Id.* at 842 n.8.

Here, the Board did not observe Guss testify. However, as the Board noted in its factual findings, "all three panel members [presiding at the hearing] recommended that [Guss's] appeal be denied. [R.R. at 42a-44a]. Board Member Rodriguez concluded, '[Guss] was not convincing in demonstrating [that] the [Board]

15

staff failed to mail the proper documents.' [R.R. at 42a]." FOF No. 76. In addition, Board Findings of Fact Nos. 79-93 support the Board's credibility determinations. These findings include: the Opt-Out Letter sent by First-Class Mail was not returned as undeliverable; the tracking information for the Opt-Out Letter sent by certified mail reflects that the letter arrived at the appropriate postal facility and that notice of the certified mailing was left at Guss's home but was not picked up; Guss received the Plan Packet, which was mailed on the same date as the Opt-Out Letter and sent to the same address; Guss was familiar with Board procedures and Code requirements; and Guss had previously failed to timely respond to Board letters. Given these factual findings, this Court cannot conclude that the Board's credibility determination was arbitrary or capricious, or otherwise flawed. Accordingly, Guss's testimony did not serve to rebut the presumption that she received the Opt-Out Letter and failed to timely respond. Therefore, substantial evidence supports the Board's conclusion that the Board mailed Guss the Opt-Out Letter.

      For all of the above reasons, the trial court's order is affirmed.

 

_____
ANNE E. COVEY, Judge

16

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Karen Guss,                              :
                    Appellant            :
                                         :
          v.                             :
                                         :
City of Philadelphia Board of            :     No. 46 C.D. 2019
Pensions and Retirement                  :

# O R D E R

AND NOW, this 6th day of July, 2020, the Philadelphia County Common Pleas Court's December 3, 2018 order is affirmed.


_____
ANNE E. COVEY, Judge